38012. ALLRID et al. v. EMORY UNIVERSITY et al.

GREGORY, Justice.

In February, 1956, following a series of convulsions, James Allrid was admitted to Emory University Hospital (Emory) for the purpose of undergoing a cerebral angiogram. This diagnostic test is performed by injecting an x-ray contrast medium into the carotid artery in the neck. A series of x-rays is taken as the contrast medium passes through the brain's arterio-venous system in order to diagnose obstructions or other abnormalities. Both a right-side and a left-side carotid study were performed on Allrid. It is undisputed that Diodrast, a non-radioactive contrast medium was used in the right-side study. The record does not clearly reflect what contrast medium was used in the left-side study, but plaintiff alleges that Thorotrast, a radioactive substance which gradually destroys body tissues, was used.

The record indicates that between February, 1956 and March, 1979, Allrid suffered from sore throats, the cause of which his physicians were unable to determine. Allrid was admitted to Crawford Long Hospital in March, 1979. At that time his physician determined that "despite an apparent history for patient having received Diodrast [in the left-side study] . . ., the present appearance suggests Thorotrast having been received instead" as "any other material would no longer be visible on x-rays." Emory records indicated that Diodrast alone had been used as the contrast medium in conducting the angiogram. In October, 1979 Allrid and his wife brought this action against Emory University and Tenneco Chemicals, Inc., a manufacturer of Thorotrast, alleging that their combined acts of negligence were the proximate cause of his injuries. Allrid subsequently died. His widow proceeds as executrix in this action. She appeals from the trial court's order granting summary judgment to Emory University Hospital. We affirm.

(1)(a) Plaintiff first argues that the trial court erred in determining that her claim is barred by the statute of limitations for medical malpractice actions, Code Ann. § 3-1102. This section provides that "an action for medical malpractice shall be brought within two years after the date on which the negligent or wrongful act or omission occurred."

Insofar as medical malpractice actions are concerned, this section replaced Code Ann. § 3-1004 which provided that an action for medical malpractice "shall be brought within two years after the right of action accrues." One exception to the limitations of Code Ann. § 3-1102 is "where a foreign object has been left in a patient's body," but the term "foreign object [does] not include a chemical compound." Code Ann. § 3-1103. Under the latter section "an action shall . . . be brought within one year after such negligent or wrongful act or omission is discovered."

Code Ann. § 3-1102 became effective July 1, 1976. Simultaneously the legislature provided for a one-year grace period prior to giving Code Ann. § 3-1102 retrospective application. "No action for medical malpractice which would be barred before July 1, 1977, by the provisions of this Chapter but which would not be so barred by the provisions of Title 3, [i.e., Code Ann. § 3-1004] in force immediately prior to July 1, 1976, shall be barred until July 1, 1977." Code Ann. § 3-1105.

The trial court correctly found that, since the alleged negligent act occurred in February, 1956 and suit was not brought until October, 1979, plaintiff's claim was barred under Code Ann. § 3-1102. *Clark v. Randall,* 155 Ga. App. 806 (272 SE2d 769) (1980). Plaintiff argues, however, that the enactment of Code Ann. § 3-1102 effected a substantive change in her vested right to bring this lawsuit, and may not be applied retroactively to bar her claim. *Enger v. Erwin,* 245 Ga. 753 (267 SE2d 25) (1980); Code Ann. § 102-104. Implicit in plaintiff's argument is the assumption that any right to bring this lawsuit had vested at the time Code Ann. § 3-1102 removed medical malpractice actions from the ambit of Code Ann. § 3-1004.

In a personal injury case, "a cause of action accrues when exposure to the hazard first produces ascertainable injury." *Everhart v. Rich's, Inc.,* 229 Ga. 798, 802 (194 SE2d 425) (1972). Plaintiff acknowledges, as she must, that her claim did not become a cognizable action until Allrid had suffered an ascertainable injury.

"[T]he true test to determine when the cause of action accrued is to ascertain the time when the plaintiff could first have maintained his action to a successful result." *U-Haul Co. v. Abreu & Robeson,* 247 Ga. 565, 566 (277 SE2d 497) (1981); *Mobley v. Murray County,* 178

Ga. 388 (1) (173 SE 680) (1933). The record discloses two injuries claimed by plaintiff to have been related to use of Thorotrast: (1) the sore throats Allrid experienced from 1956 to 1979 and (2) Allrid's debilitated physical condition in March, 1979 and subsequent death. If plaintiff contends her cause of action relates to the sore throats Allrid first experienced in 1956, her claim would have been barred by Code Ann. § 3-1004 because Allrid waited more than two years after his cause of action accrued to bring this lawsuit. If plaintiff's claim is that the ascertainable injury occurred in March, 1979, no cause of action accrued until that time; thus, her right to bring this lawsuit did not come into being until over two years after Code Ann. § 3-1102 removed medical malpractice actions from the scope of Code Ann. § 3-1004. It cannot be said that the enactment of Code Ann. § 3-1102 operated to deprive plaintiff of a vested right. We, therefore, conclude that Code Ann. § 3-1102 has not been unconstitutionally applied to plaintiff.

While we are constrained by the terms of Code Ann. Ch. 3-11 to reach this result, we find Code Ann. § 3-1102 to be an extremely harsh limitation in application because it has the effect, in many cases, of cutting off rights before there is any knowledge of injury. Nonetheless, the legislature has the power, within constitutional limitations, to make such provisions.

(b) "A statute of limitation is remedial in nature. The legislature can constitutionally provide for the retrospective application of a remedial statute provided a time be fixed subsequent to the passage of the statute which allows citizens affected by it a reasonable time to protect their rights." *Jaro, Inc. v. Shields,* 123 Ga. App. 391, 392 (181 SE2d 110) (1971). Plaintiff takes the position that the one-year grace period provided by Code Ann. § 3-1105 is, as a matter of law, an unreasonable time period in which claimants may protect their rights. However, we agree with the trial court that, in effect, the grace period provided in Code Ann. § 3-1105 is not simply one year, "but one year *plus* the number of years which have passed between the date of the alleged wrongful act and the effective date of Code Ann., § 3-1102; or in this case one plus [over] twenty years. When viewed in this appropriate context, the one year grace period provided in § 3-1105 is reasonable."

No cause of action which existed on July 1, 1976, the effective date of Code Ann. § 3-1102, was immediately barred by the statute. *Every* such cause of action survived for at least the grace period of one year. Code Ann. § 3-1105. Some causes of action became barred by the statute after the grace period but before two years had elapsed. (This is so because the date on which the breach occurred was within one year preceding the effective date of the statute. All other such causes

of action are governed by the two-year limitations period as set out in Code Ann. § 3-1102.)

The theory advanced by plaintiff and expressed in *Hart v. Eldridge,* 158 Ga. App. 834 (282 SE2d 369) (1981), will not be followed. There the Court of Appeals indicated that, during the grace period, Code Ann. § 3-1004 would continue to be applied. We do not interpret Code Ann. § 3-1105 in that manner. We interpret Code Ann. § 3-1105 to mean that Code Ann. § 3-1102 is effective beginning July 1, 1976, but that no action will be barred under its terms until July 1, 1977.

(c) Plaintiff next argues that Code Ann. Ch. 3-11 violates equal protection of the laws. Plaintiff concedes that the standard of review in this case is the "rational basis" test. This standard requires that classifications created by a state "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Reed v. Reed, 404 U. S. 71, 76 (92 SC 251, 30 LE2d 225) (1971); *Bickford v. Nolen,* 240 Ga. 255, 256 (240 SE2d 24) (1977).

We have held that a separate classification of medical malpractice actions under Code Ann. Ch. 3-11 is a rational exercise of legislative power. *Hamby v. Neurological Associates, P. C.,* 243 Ga. 698 (256 SE2d 378) (1979). Plaintiff argues, however, that Code Ann. §§ 3-1102 and 3-1103, supra, create "arbitrary classifications among medical malpractice plaintiffs." Plaintiff maintains that providing a separate statute of limitations for actions where a foreign object is left in a patient's body "bears no substantial relationship to the governmental interest sought to be protected."

In *Dalbey v. Banks,* 245 Ga. 162, 163-4 (264 SE2d 4) (1980), we held that "[w]hen a physician places a foreign object in his patient's body during treatment, he has actual knowledge of its presence. His failure to remove it goes beyond ordinary negligence so as to be classified by the legislature as a continuing tort which tolls the statute of limitations until the object is discovered. The purpose of the legislature in making a distinction between the two types of medical malpractice was to allow the plaintiff's claim which does not rest on professional diagnostic judgment or discretion to survive until actual discovery of the wrongdoing. In such situations the danger of belated, false or frivolous claims is eliminated. The foreign object in the patient's body is directly traceable to the doctor's malfeasance." Our holding in *Dalbey* clearly reflects a determination by this court that the classification created by Code Ann. § 3-1103 bears "a fair and substantial relation to the object of the legislation." Reed, supra, at 76. We find plaintiff's equal protection claim to be without merit.

(d) Nor do we agree with plaintiff's contention that Code Ann. § 3-1102 violates due process because it denies her access to the courts. Statutes of limitation, by their very nature, bar access to the courts after the prescribed period of time has elapsed. "Statutes of limitation . . . in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Order of Railroad Telegraphers v. Railway Exp. Agency, 321 U. S. 342, 348-9 (64 SC 582, 88 LE 788) (1943). While we are not unsympathetic with plaintiff's dilemma, this case exemplifies the necessity of establishing rules which will bar stale claims: the alleged event leading to Allrid's injury occurred a quarter of a century ago; the physician who allegedly injected Thorotrast into Allrid is deceased; and the record clearly shows that physicians on staff at Emory at the time the angiogram was performed have, understandably, vague recollections of the events surrounding Allrid's case. We, therefore, find this enumeration to be without merit.

(2) The trial court found that if Dr. Fincher, the physician who performed the angiogram on Allrid in 1956, knowingly injected Allrid with a potentially hazardous substance and failed to warn him of the same, these facts would be sufficient to constitute fraud which would toll the statute of limitations under Code Ann. § 3-807.[1] However, the trial court also found that the "uncontroverted evidence" establishes that Dr. Fincher was not an agent of Emory Hospital; therefore, any negligence which might be attributable to Fincher could not be imputed to Emory.

Plaintiff argues that whether Dr. Fincher was an agent of Emory is a question of fact for the jury.

"The rule is that for the hospital to be held liable it must be shown that the doctor was an employee of the hospital and not an independent contractor." *Ga. Osteopathic Hospital v. Hollingsworth,* 242 Ga. 522 (250 SE2d 433) (1978). "The true test of whether the relationship is one of employer-employee or employer-

---

[1] This section provides: "If the defendant, or those under whom he claims, shall have been guilty of a fraud by which the plaintiff shall have been debarred or deterred from his action, the period of limitation shall run only from the time of discovery of the fraud."

independent contractor is whether the employer, under the contract either oral or written, assumes the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Hodges v. Doctors Hospital,* 141 Ga. App. 649, 651 (234 SE2d 116) (1977).

The record shows that Fincher, while on staff at Emory, had no contract with the hospital nor did the hospital compensate him. Emory did not carry insurance on him. Further, Fincher rented office space in the Emory facilities. The affidavit of the Administrator of Emory University Hospital from 1952 to 1977 states that "Emory did not control, or did it have the right to control the time, manner or method in which Dr. Fincher treated his patients." The record also demonstrates that, in 1956, staff physicians at Emory controlled the flow of drugs into the Emory Hospital pharmacy without supervision from the hospital administration; that it was customary for staff physicians to bring otherwise unavailable, and sometimes experimental, drugs into the hospital for use in treating patients; and that there was no procedure whereby these physicians coordinated these practices with any hospital policy. We agree with the trial court that a careful examination of the record demonstrates that Emory's evidence is in no way controverted by plaintiff. Plaintiff attempts to controvert this evidence by noting that Fincher was required to attend staff meetings and by citing a hospital policy that staff physicians had the right to object to unreasonable procedures used by other staff physicians. However, where a "hospital reserve[s] no right to control specific medical techniques employed by the . . . doctors, but merely exercise[s] a limited surveillance in order to monitor the quality of medical care provided," these controls are not inconsistent with an employer-independent contractor relationship. *Overstreet v. Doctors Hospital,* 142 Ga. App. 895, 897 (237 SE2d 213) (1977).

Further, "[w]here a physician is an independent contractor the hospital is not liable for his negligent performance of professional services unless it negligently selected him or undertook to direct him in the manner and method of treating the patient." *Hollingsworth v. Ga. Osteopathic Hospital,* 145 Ga. App. 870, 871-2 (245 SE2d 60) (1978), affd., 242 Ga. 522 (250 SE2d 433) (1978), supra. Accord, *Moore v. Carrington,* 155 Ga. App. 12 (270 SE2d 222) (1980). Plaintiff does not argue that Emory negligently selected Dr. Fincher or directed him to use Thorotrast in conducting the angiogram. We find this enumeration of error to be without merit.

(3) Plaintiff next argues that Emory committed a fraud independent of Dr. Fincher's actions which tolled the statute of

limitations. Plaintiff takes the position that Emory was under a duty to disclose to Allrid that a dangerous substance had been used in performing the angiogram. The plaintiff maintains that since Thorotrast was only used on "a few patients per year" at Emory, disclosure of its use would not have constituted an undue burden.

The rule in Georgia is that " '[a] private hospital is under a duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition *which is known to the hospital through its agents and servants* charged with the duty of looking after and supervising the patient may require.' " (Emphasis supplied.) *Doctors Hospital v. Poole,* 144 Ga. App. 184 (241 SE2d 2) (1977). There is no evidence in the record of this case to demonstrate that anyone other than Dr. Fincher was aware of what contrast medium had been used in the left-side carotid study. The record does not bear out plaintiff's contention that Dr. Rogers, the radiologist who assisted Dr. Fincher in reading Allrid's x-rays, knew that Thorotrast had been used. In his deposition Dr. Rogers stated that when he read Allrid's x-ray in February, 1956, "it must have been in my mind that possibly not Diodrast but some other agent was used [in the left-side study] because *if I had known the agent* I'm sure I would have stated the agent [on the patient's chart] if I had known with certainty." (Emphasis supplied.) Rogers also stated his belief that based on an examination of x-rays, "there is no radiologist living . . . that could take two studies, one with Thorotrast and one with Diodrast, and be sure which agent was used." As noted above, Dr. Fincher's entry on Allrid's chart following the angiogram showed that only Diodrast had been used.

We are unwilling to hold that Emory was required to disclose the dangers of a contrast medium allegedly used in diagnosing a patient's condition when there is no evidence to show that either Emory or its agents were aware that this medium had been used. Nor do we find that the failure to make this disclosure constituted actual fraud which would toll the statute of limitations.

(4) In August, 1980 Emory filed a motion for summary judgment as to three issues: (a) that plaintiff's claim was barred by the statute of limitations, Code Ann. § 3-1102; (b) that Dr. Fincher was not an agent of Emory at the time of Allrid's cerebral angiogram and, thus, Emory was not liable for any negligence attributable to him; and (c) Allrid consented to the treatment he received at Emory. In October, 1980 plaintiff amended her complaint to allege that Emory was also liable as a supplier of a dangerous chattel in that Emory allegedly supplied the Thorotrast used in performing the cerebral angiogram on Allrid in 1956. In her briefs and at the hearing on the motion for summary judgment, plaintiff relied on the

Restatement of the Law of Torts, Second § 388 as authority for this argument.[2] Emory did not amend its motion to move for summary judgment on this issue. In the order granting Emory's motion for summary judgment, the trial court addressed each of the three issues on which Emory sought summary judgment, but did not reach the issue of Emory's liability under the "supplier of dangerous chattel" theory.

Pretermitting a determination of whether a hospital may be held liable as a "supplier of dangerous chattel" under the theory plaintiff advances, we find that the issue of Emory's liability under this theory was not resolved by the trial court's order. We conclude that the effect of the trial court's order was to grant partial summary judgment to Emory, but to reserve for future determination the issue of "supplier of dangerous chattel."

*Judgment affirmed. All the Justices concur, except Jordan, C. J. and Smith, J., who dissent.*

DECIDED FEBRUARY 17, 1982.

*Phillips, Hart & Mozley, George W. Hart, Philip C. Henry, W. Edward Andrews,* for appellants.

*Freeman & Hawkins, J. Bruce Welch, Daryll Love, John A. Gilleland, Robert S. Wiggins, Troutman, Sanders, Lockerman & Ashmore, Daniel S. Reinhardt, King & Spalding, Kirk M. McAlpin,* for appellees.

JORDAN, Chief Justice, dissenting.

I would affirm the trial court's grant of a total summary judgment in favor of the appellees. I therefore respectfully dissent.

---

[2] The Restatement of the Law of Torts, Second, § 388 provides: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."