A95A1333. FORTUNE et al. v. PRINCIPAL FINANCIAL GROUP, INC. et al.

A95A1334. ETHRIDGE v. PRINCIPAL FINANCIAL GROUP, INC. et al.

(465 SE2d 698)

BLACKBURN, Judge.

Evelyn Ethridge and John and Denise Fortune appeal from the grant of summary judgment to the Principal Financial Group, Inc. and the Principal Mutual Life Insurance Company (Principal). In their suits against Principal and Ernie Malcolm James, Ethridge and the Fortunes sought damages arising out of their investments in the "Principal Manager's Fund," a non-existent fund which James falsely represented to be a Principal fund. In identical four-count complaints against Principal, they alleged that James made false representations to them as Principal's agent; that Principal breached its contract with them; that Principal negligently hired James as its agent; and that Principal negligently failed to adequately regulate, supervise, and monitor James. We have consolidated these closely-related appeals for disposition in a single opinion.

1. Ethridge and the Fortunes urge that the trial court erred in granting summary judgment to Principal in that genuine issues of material fact remain as to Principal's liability in tort. In this regard, they argue that jury questions exist as to whether James may be deemed to have acted within the scope of actual or apparent agency on behalf of Principal; as to whether Principal was negligent in hiring and supervising James; and as to whether Principal breached investment contracts with the Fortunes and Ethridge.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. [Cit.] A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. [Cit.] A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

The evidence reflects that Ethridge and the Fortunes met James

as a result of their common membership in the same church. Ethridge had heard that James taught Sunday school and had friends at church who had invested money through him. The Fortunes and James had taught Sunday school together. Over dinner one evening in his home, James told the Fortunes that he was a Principal agent able to handle "all kinds of insurance, plus securities and investments." It was upon this background that Ethridge and John Fortune later contacted James for the purpose of seeking his assistance in making Individual Retirement Account (IRA) investments.

On each occasion, James advised that he could do so; however, he indicated that he could make them more money if they allowed him to first invest their funds in the Principal Manager's Fund (Fund). Ethridge invested $3,000 upon James' recommendation that she defer making a $2,000 IRA investment until the April deadline for doing so. The Fortunes invested a total of $12,000 in the Fund on the understanding that James would later move $4,000 from it to a Principal IRA.[1] In both cases, the investment checks *were written by the appellants directly to James*, not to Principal. Principal never received the funds and had no knowledge of the transaction. In turn, *James personally executed and delivered promissory notes to appellants* promising repayment with interest at a date certain and said notes did not purport to bind Principal. Neither the Fortunes nor Ethridge asked to be shown the Fund's prospectus. Apart from his business cards which James showed John Fortune, both relied exclusively on James' oral representations as to the scope of his authority on behalf of Principal Mutual.

"An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." OCGA § 51-2-4. In the absence of evidence of actual control, the test distinguishing an employee from an independent contractor is whether the employer assumed " 'the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.' [Cit.]" *Allrid v. Emory Univ.*, 249 Ga. 35, 40 (285 SE2d 521) (1982).

Principal and its predecessor entity, the Bankers Life Company, entered into five contracts with James between July 16, 1984 and October 1, 1990. Although termed agent's contracts, each contract denominated James' status as that of an independent contractor. In Georgia, such a contractually conferred designation is presumed true

---

[1] James promised Etheridge and John Fortune that any money invested in the Fund would earn interest at the rate of ten percent.

unless other evidence is introduced to show that the employer exercised control as to the time, manner and method of performing the work sufficient to establish an employer-employee relationship. *Lagoueyte v. Rocket Express*, 196 Ga. App. 143 (395 SE2d 389) (1990). "On the other hand, where the contract specifies that the employee's status shall be that of independent contractor but at the same time provides that he shall be subject to any rules or policies of the employer which may be adopted in the future, no presumption arises." (Punctuation omitted.) *Ross v. Ninety-Two West*, 201 Ga. App. 887, 891-892 (412 SE2d 876) (1991).

Neither Ethridge nor the Fortunes assert that James was contractually denominated as other than an independent contractor of Principal. Such contracts made Principal's "rules, requirements and instructions" applicable to James; however, unlike *Gulf Life Ins. Co. v. McDaniel*, 75 Ga. App. 549 (43 SE2d 784) (1947), cited by the dissent, they did so only to the extent that these were not inconsistent with his status as an independent contractor. Further, although the dissent cites *Franklin Life Ins. Co. v. Hill*, 136 Ga. App. 128, 133 (4) (220 SE2d 707) (1975) for the proposition that susceptibility to monitoring, grading and discharge will deny an insurance agent status as an independent contractor, *Franklin* was decided principally upon the fact that the agent therein was a manager in a hierarchical organizational structure. As such, he supervised those below him and was subject to the supervisory control of those who were above him in the company. Id. Both *Gulf Life* and *Franklin* are here inapposite on the basis of other factors as well. Among these, Principal did not specify or restrict James' sales territory; Principal allowed James to sell the products of other companies;[2] and Principal did not require James to work out of a certain location or require him to attend scheduled training for company agents.[3] Moreover, the contracts authorized James to solicit life and health policies and annuity contracts for Principal and denied him authority to "[i]ncur any liability or debt against us" or to "accept risks or contracts of any kind or bind us in any way."

While Ethridge and the Fortunes correctly contend that Principal enabled James to distribute company business cards describing himself as an agent and brochures describing its insurance products, such evidence is insufficient to establish that James lacked indepen-

---

[2] While a Principal broker, James held broker contracts with United Family Life Insurance Company, American Family Life Insurance Company, Integrity Life Insurance Company, Credit Life Insurance Company, Hartford Life & Accident Insurance Company, Ameritas Life Insurance Corporation, and Northwestern Mutual Insurance Company.

[3] Principal made training available to its brokers, including James, but it was not mandatory that they attend.

dent contractor status. " 'In passing upon a motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists.' (Citation and punctuation omitted.) *Withrow Timber Co. v. Blackburn*, 244 Ga. 549, 553 (261 SE2d 361) (1979)." *McElroy v. Cody*, 210 Ga. App. 201, 202 (435 SE2d 618) (1993). In this regard, it is undisputed in the record that James did not have authority under his contracts with Principal to sell investment funds or securities; Principal never received any money from James' sales of the Fund; and, on July 25, 1991, it terminated James upon first learning that it existed.

Citing *Jester v. Hill*, 161 Ga. App. 778 (288 SE2d 870) (1982), the dissent notes that a jury may impute liability to an insurance provider upon evidence that the criminal acts of an independent insurance broker resulted out of apparent authority it conferred upon such agent to so act.

" 'In order to recover under (an apparent or ostensible agency) theory, however, a plaintiff must present evidence that: (1) the apparent principal represented or held out the apparent agent; and (2) justifiable reliance upon the representation led to the injury. Further, it is not enough that plaintiff simply believe there is an agency relationship. There is an objective standard. The apparent principal must represent or hold out the apparent agent. Then, too, justifiable reliance must lead to the injury.' (Citations and punctuation omitted.) [Cit.]" *Marcoux v. Northside Realty Assoc.*, 207 Ga. App. 99, 100 (427 SE2d 72) (1993). While the dissent correctly points out that Principal provided James business cards which described him as an agent of the Principal Financial Group, it fails to note that it provided James two other business cards neither of which describes him as such an agent. Moreover, the record reflects that only Fortune was shown a business card, a card which indicated that James was an agent of the Principal *Insurance* Company rather than the Principal Financial Group. Otherwise the evidence is that Ethridge and Fortune "invested" in the Fund in reliance upon James' reputation as an insurance agent in the church of which they were members and his own representations as to his authority. Under these circumstances, Principal may not be deemed to have clothed James with apparent authority to act as its agent and liability based thereon necessarily cannot arise. *Jester*, supra.

Also citing *Jester*, the dissent asserts that liability for negligent selection of an insurance broker may arise in an insurance provider if such an independent contractor is deemed to have "a poor general reputation in the insurance community." Id. at 783. However, in *Jester* this Court held only that upon such evidence a jury question arises as to the adequacy of the insurance provider's pre-employment

background check to discover propensity in the prospective independent insurance broker for fraudulently using insurance flyers and application forms. Id. at 783-784.

Unlike *Jester*, there is here no evidence that James had a poor general reputation in the insurance community which would have been readily discoverable by "any reasonable investigation." Id. at 783. Instead, the evidence reflects that Principal employed Equifax Services to provide it background information pertinent to all applicants for employment, including James. When Principal rehired James in 1990, Equifax reported that the Northwestern Mutual Insurance Company, James' employer at the time he was being considered for re-employment, regarded his business expertise as excellent and that he was there earning $50,000 a year in a managerial position. Principal had high regard for James as well in that he had successfully worked for Principal earlier as a life insurance agent known for integrity. Although Equifax also reported that two insurance companies for whom James had previously worked declined to divulge the basis upon which his employment had been terminated, they did so on the basis of neutral, company-wide policy, rather than for cause. Finally, our review of the record indicates that Principal made a good faith effort to resolve conflicting information in James' pre-employment file.[4]

James did not disclose, and Equifax did not report, that he had been employed and terminated by Cotton States Mutual Life Insurance Company for, among other things, the misapplication of insurance premiums. " 'An employer's liability for negligent hiring or retention of an employee requires proof that the employer knew or should have known of the employee's violent and criminal propensities. [Cits.]' " *Diaconescu v. Hettler*, 210 Ga. App. 191, 193 (435 SE2d 489) (1993). Lying about personal and professional qualifications in applying for employment does not constitute such proof. *Edwards v. Robinson-Humphrey Co.*, 164 Ga. App. 876, 880 (298 SE2d 600)

---

[4] Notwithstanding the dissent's claim to the contrary, Principal followed up to resolve favorably to James' conflict between a pre-employment written statement in which he indicated he had not worked beyond the insurance industry and an Equifax report that indicated he had previously sold Herbalife products. We are unable to find evidence in the record to support the dissent claim that James refused to answer the question "Can you remain at this job?" in applying for re-employment with Principal while still employed by Northwestern Mutual. Rather, there is only evidence that James did not respond to such question when completing his application for employment. Finally, the dissent correctly indicates that Principal did not make further inquiry upon the "not eligible for reappointment" response it received to its letter of inquiry sent to the Liberty Mutual Life Insurance Company, one of James' former employers. The dissent fails to point out, however, that Liberty Mutual explained James' ineligibility for re-employment as "[d]ue to Company's policy not to rehire after two previous connections." Under these circumstances, we submit that further inquiry by Principal was neither reasonably required nor appropriate.

(1982). That Principal's employment file on James reflected that he had experienced long-term financial difficulties as evidenced by a bankruptcy, personal indebtedness reduced to judgment and garnishment action, a Georgia tax lien against him, and a low score[5] on a pre-employment agent qualifications test likewise do not constitute proof of propensity to commit any crime, job-related or otherwise, particularly in light of James' employment record while first with Principal. Principal satisfied its duties in the investigation and hiring of James. See OCGA § 33-23-8 (e).

Although it does not regularly occur, "a case may present a factual situation wherein the issue of the existence or non-existence of the master-servant relationship is properly decided as a matter of law. [Cit.] This is such a case." *Dennis v. Malt*, 196 Ga. App. 263, 266-267 (395 SE2d 894) (1990). Viewing the evidence in a light most favorable to Fortune and Ethridge, we conclude that James was here an independent contractor and that liability in Principal for negligently hiring him as such does not lie. Accordingly, the trial court's grant of summary judgment was proper. *Lau's Corp.*, supra at 491.

2. In light of our disposition of Division 1, we do not reach appellants' remaining enumerations of error.

*Judgments affirmed. Beasley, C. J., Birdsong, P. J., Andrews, Johnson and Smith, JJ., concur. McMurray, P. J., Pope, P. J., and Ruffin, J., dissent.*

McMurray, Presiding Judge, dissenting.

I respectfully dissent as I do not agree with the majority that the Fortunes and Etheridge are precluded (as a matter of law) from recovering based on a theory of respondeat superior. Specifically, I believe there is proof that would authorize a jury's finding that Ernie Malcolm James was Principal's actual agent or, alternatively, that Principal clothed James with (apparent) authority to act as an authorized agent. Furthermore, I do not believe that Principal's liability for negligent hiring and retention is foreclosed by a finding that Ernie Malcolm James acted outside the scope of his agency or that James was an independent contractor. Unlike liability based on respondeat superior, a principal may be liable for negligent hiring and retention if there is proof that the principal failed to act reasonably in selecting

---

[5] James scored 12 on a test denominated the Aptitude Index Battery (AIB) in 1984; 13 was then the minimum permissible score in Principal's experienced agent category. Principal waived such testing for James in 1990 at the time of his re-employment; however, by that time the minimum permissible score had been reduced to 11. Notwithstanding James' low score in this testing, Principal viewed him as a qualified agent in light of his long career and experience, six years of which had been with Principal. In rating him overall, inclusive of his low AIB score and a prospective market evaluated only as "fair," James was rated as eligible for employment pursuant to Principal's numerical rating guide.

or retaining an independent contractor or agent for a position of public or private trust.

*Respondeat Superior: Actual Authority.* In *Gulf Life Ins. Co. v. McDaniel*, 75 Ga. App. 549 (43 SE2d 784), cert. dismissed at 203 Ga. 95 (45 SE2d 64), this Court held that an insurance agent's agreement to conform to all company rules and regulations, along with the company's right to revoke the agency at any time, constitutes sufficient indicia of control to authorize a finding of agency. Id. at 554. Such circumstances stand unrefuted in the case sub judice. Principal not only had the right to terminate James at any time, James agreed to obey all of Principal's rules, regulations and instructions.[6] Nonetheless, the majority discounts this evidence by citing a term in the parties' agency agreements which provides that James is only required to comply with Principal's rules "to the extent that these were not inconsistent with his status as an independent contractor." The problem with this logic is that the above exception means nothing if the parties' agreement, relations and conduct exclude the possibility that James is an independent contractor. See *Gulf Life Ins. Co. v. McDaniel*, 75 Ga. App. 549, 554-558, supra. In other words, if the circumstances indicate that Principal had the right to exercise certain control over James, other than just to see that the general terms of the parties' agreement were met, then a jury would be authorized in finding that an agency (rather than an employer-independent contractor) relationship existed. *Quinan v. Standard Fuel Supply Co.*, 25 Ga. App. 47 (1) (102 SE 543). Accordingly, it is from this perspective that I observe that James agreed (in two agency contracts) "to devote [his] principal business activity to the solicitation of life and health insurance policies or annuity contracts for Principal"; that Principal provided James with material for marketing its products; that James was subject to the supervision and control of a Principal manager; that this manager monitored, graded and assisted James at least once a week, and that James utilized and was subject to Principal's marketing techniques and sales goals.[7] Under strikingly similar circum-

---

[6] It is not only undisputed that Principal had the right to terminate James at any time, but there is little doubt that such termination was inevitable had James proved to be an unproductive sales agent or had he disobeyed Principal's rules, regulations and instructions.

[7] While the majority states that "Principal allowed James to sell the products of other companies," two of the agency contracts James executed were entitled, **"Career Agent's Contract,"** and required James "to devote [his] principal business activity to the solicitation of life and health insurance policies or annuity contracts for Principal Mutual Life Insurance Company." These contracts referred to James as a "full-time" agent and provided in a section entitled, **"AFFILIATION WITH COMPANY,"** as follows: "You agree, in exchange for the issuance of this full-time agent's contract and the valuable incidents to which it entitles you, to submit all of your applications for policies, except for [group plans of employer sponsored life and health insurance benefits, known as PEP (Planned Employee Program)], to us for underwriting and approval. You are free to sell the applicant a policy issued by

stances, this Court held in *Franklin Life Ins. Co. v. Hill*, 136 Ga. App. 128, 132 (4) (220 SE2d 707), that "[i]t is unrealistic to contend that under [such hierarchical methods of control] or organization [an insurance agent is] a mere independent contractor for whose actions the company had no responsibility. [Cits.]" Id. at 132-133 (4). For the same reason, I believe the majority in the case sub judice incorrectly characterizes James (as a matter of law) as an independent contractor for whose actions Principal has no responsibility. For the reasons stated, I stand " 'unequivocally committed to the doctrine that the jury are arbiters of [such] issues of fact.' *Hines v. Chappell*, 1 Ga. App. 480, 482 (58 S. E. 220)." *Gulf Life Ins. Co. v. McDaniel*, 75 Ga. App. 549, 553, supra.

*Respondeat Superior: Apparent Authority.* In *Jester v. Hill*, 161 Ga. App. 778 (288 SE2d 870), this Court held that a jury may impute liability to insurance providers where there is evidence that the criminal acts of an independent insurance broker (i.e., retaining the plaintiff's insurance premiums but not effecting issuance of an insurance policy) were accomplished because the insurance providers clothed the broker with apparent authority to issue their insurance policies. Id. at 780 (1). The basis of this holding was the maxim that " '[a]n estoppel will arise when a principal places an agent in a position of apparent authority, so that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption. *Commercial Credit Corp. v. Noles*, 85 Ga. App. 392, 396 (69 SE2d 309).' " Id. at 780 (1), 783. And the circumstances authorizing application of this rule was mere proof that the insurance providers gave the brokerage firm the advertising flyer and the insurance application (with their respective names printed thereon) the unscrupulous broker used to compel the plaintiff to part with his premium. Id. at 780 (1), 781.

In the cases sub judice, Principal provided James with business cards characterizing him as an "Agent" of "the Principal Financial Group," and advertising brochures describing Principal's insurance

---

another company if we decline the application or the applicant does not accept the policy as issued. You are not required to submit applications for PEP to us first." Similar language appeared in another agency contract James executed entitled, **"Career Assessment Phase."**

The majority also incorrectly concludes (as a matter of law) that "Principal did not require James . . . to attend scheduled training for company agents." There is proof that James was contacted (at least once a week) by a Principal supervisor who monitered and encouraged James, gave James direction on how to improve his skills and graded each and every contact James made on behalf of the company. In fact, there is proof that Principal offered James training for developing his skills as an insurance agant and provided James with materials aimed at marketing Principal's insurance products and financial planning services.

and securities products, i.e., disability insurance, individual retirement accounts and various savings plans. These marketing brochures were embossed with the logo, "The Principal Financial Group," and comic strip scenes portraying Principal's products as a secure haven for customers' foreseen and unforeseen hardships. Also inscribed on these advertising brochures (but not mentioned in the majority opinion) are portrait-type photographs of Ernie Malcolm James and a standardized greeting from James (designed to instill trust and confidence), James' signature, and his business address and phone number. It is my view, that these circumstances, evidence that Principal was publicly marketed (at times pertinent to the case sub judice) as an established insurance and securities provider and that Evelyn Etheridge and John Fortune trusted James because of his association with Principal, raise genuine issues of material fact as to whether Principal is estopped to deny agency, and therefore liability based on respondeat superior.

*Negligent Hiring and Retention.* Unlike liability based on respondeat superior, an employer may be liable under a theory of negligent hiring and retention if an employee injures a third party while acting outside the scope of his employment. *Henderson v. Nolting First Mtg. Corp.*, 184 Ga. 724, 733 (2) (193 SE 347). Further, this Court has held that an insurance provider may be liable for negligent selection of an independent insurance broker if it is unrefuted that such an independent contractor "had a poor general reputation in the insurance community." *Jester v. Hill*, 161 Ga. App. 778, 783 (2), supra. Indeed, this holding is consistent with the Georgia Supreme Court's ruling that an employer may be liable for the negligent acts of an independent contractor if public policy demands imposition of such a duty. *Peachtree-Cain Co. v. McBee*, 254 Ga. 91 (1) (327 SE2d 188). And in this vein, it is relevant in the cases sub judice that Georgia's public policy has long required insurance providers to investigate the background and qualifications of any person who applies for an insurance agent's or subagent's license or certificate of authority. See OCGA § 33-23-8 (e) and former OCGA § 33-23-8 (a) (3) (A) (Code 1933, § 56-811a, enacted by Ga. L. 1960, pp. 289, 293, § 1, p. 420, Ga. L. 1980, pp. 1163, 1164, § 4, p. 1165). In fact, since 1992 Georgia law has required insurance providers to document the extent of such investigations and certify that their applicants are trustworthy and qualified to act as insurance agents. OCGA § 33-23-8 (e).

In the cases sub judice, there is no conclusive proof that Principal complied with its public duty to make its own reflective inquiry into James' character and ability as a professional insurance agent.[8] Spe-

---

[8] Indeed, a "Personal History Form" from Ernie Malcolm James in Principal's employ-

cifically, Principal cites no evidence that it checked the personal references James provided when he applied to serve as a Principal insurance representative, and it appears that Principal failed to make a deeper inquiry when one of James' former employers noted (in response to a letter of inquiry) that James is *not* eligible for reappointment. It also appears that Principal never attempted to resolve an apparent discrepancy between a report from a private investigator, indicating that James sold "Herbalife" products in 1984, and a statement James made on a "Personal History" form, dated June 1990, indicating that he has no "selling experience" outside insurance and securities. Further, Principal fails to explain why no inquiry was made when James failed to answer the following question on his "Personal History" questionnaire: "Can you remain at [your current] job?" And it does not appear that Principal made inquiry in response to the following notation on a report on James submitted by a private investigator: "We have attempted to contact Mr. James in this investigation on numerous occasions but he has not been available." It is my view, that these circumstances, along with proof that Principal was aware of James' prior financial difficulties, his termination by another insurance carrier for alleged misapplication of policy premiums, and his failure to measure up to Principal's own quality standards (as gleaned from standardized agent-evaluation procedures), raise genuine issues of material fact as to Principal's liability for negligent hiring and retention of James. To say otherwise (in my view) diminishes the legislative mandate that insurance providers document and certify that their agents are trustworthy and qualified insurance professionals. See OCGA § 33-23-8 (e).

I am authorized to state that Presiding Judge Pope joins in this dissent.

DECIDED NOVEMBER 17, 1995 —
RECONSIDERATION DENIED DECEMBER 6, 1995 — 

*Taylor & Roberson, Leah O. Taylor, Ted Taylor, Jerry D. Roberson, John P. Tucker, Jr.*, for appellants.
*Carter & Ansley, Ben Kingree III, Elizabeth J. Bondurant*, for appellees.

ment records indicates that Principal was more concerned with James' ability to develop business with friends and acquaintances (via detailed inquiry into James' civic and social activities) than with his personal character and his ability as a professional insurance agent.