[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 26, 2010
JOHN LEY
CLERK

_____

No. 09-11458

_____

D. C. Docket No. 08-00037-CV-2

LINDA DEEN, individually and
in her capacity as Temporary Administrator
of the Estate of Kenneth Deen,

Plaintiff-Appellee,

versus

SHANNON EGLESTON, D.M.D.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(February 26, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit,
sitting by designation.

The central question raised by this appeal is whether a Georgia legislative scheme governing statutes of limitations for tort claims in medical malpractice is rationally related to the state's interest in providing for the health and welfare of its citizens. The district court struck down, under the Equal Protection Clause, a state statute that did not exempt the "legally incompetent" from the general two-year statute of limitations. In so doing, however, the district court overlooked the essential principle that matters of social and economic policy, particularly when they come to bear on the health and welfare of a state's citizens, are quintessentially legislative in nature. After thorough review, we hold that Georgia's legislative scheme is rationally related to a legitimate state interest, reverse the denial of summary judgment for appellant Shannon Egleston, D.M.D., and remand for further proceedings consistent with this opinion.

I.

A.

We consider the unsettling facts of this case in a light most favorable to the appellee Linda Deen, the non-movant. On July 18, 2005, Kenneth Deen went to the dentist because his gums were swollen and there was pus draining out of them. He went to Gentle Dental in Brunswick, Georgia, where he was evaluated by Shannon Egleston, D.M.D. Dr. Egleston referred Deen to Randolph M. Stevens,

2

D.D.S., an endontist.

The next day, Deen went to see Dr. Stevens, who informed him that his tooth (number nine) was infected. Dr. Stevens prescribed an antibiotic for Deen and planned a root canal; he also called Gentle Dental to advise the office of his diagnosis. But no one at Gentle Dental wrote down in Deen's chart that Dr. Stevens had called, let alone document his recommended course of treatment.

On August 4, 2005, Deen returned to Gentle Dental, where he received a full mouth debridement from a hygienist. A full mouth debridement is more invasive than a typical cleaning. It is appropriate when there is a heavy build-up of calculus on the teeth, and is typically performed when a patient has not had a dental cleaning in some time. Deen's chart does not reflect that any dentist saw him on that day, even though Georgia law requires that a dentist examine every patient who receives a cleaning.

During this period, Deen was also suffering from a bad back. Attempting to discern the source of the problem, he had a CAT scan of his lumbar spine on June 10, 2005, and a lumbar myelogram on August 11. He was having headaches as well, which he attributed to the back problem. His headaches got so bad that on August 14 he decided to go to the emergency room. Doctors there performed a blood patch, a procedure by which they "put blood in the spinal area where the

3

lumbar puncture was done to allow it to clot to ease his headache."

The headaches persisted nonetheless, and on August 18, one of Deen's eyes began to bulge so that the surrounding tissue covered the white of the eye. Deen went back to the emergency room that evening, where he was given morphine and a prescription for eye medicine. He was discharged at around two in the morning.

At around ten in the morning on August 19, Deen went back to the hospital to have a CAT scan of his brain. He was behaving abnormally that morning. In the car on the way to the hospital, he attempted to light a cigarette using a water bottle. Once he arrived at the hospital, Deen was unable to correctly answer several basic health questions posed to him by a nurse, including whether he smoked or whether he had cancer. Hospital staff performed the scan nevertheless and Deen was discharged in the early afternoon.

Later that afternoon, Linda Deen learned that the CAT scan had revealed swelling of the brain, and that she was to bring Kenneth back to the hospital immediately. She found him napping in a chair, but when she tried to take him to the hospital, she could not wake him. He had a temperature of 106, and she called 911.

He was rushed by ambulance to the Southeast Georgia Regional Medical Center, where he was admitted to the surgical intensive care unit ("SICU").

4

Doctors performed a battery of tests, including a lumbar puncture, a bronchoscopy, and a CAT scan. It was around 10 p.m. when Linda Deen was first able to see her husband; at that point, he was intubated, unconscious, and noncommunicative: "you could tell he was very sick. His eye was still very swollen, protruding." He was diagnosed with a subdural empyema resulting in brain damage, and was rendered permanently disabled.

Linda Deen spent that night (and every night, for about five weeks) in the SICU by his side. His treatment at the hospital, meanwhile, continued. Over the next few days, doctors performed a number of other tests and procedures: a CAT scan, an MRI scan, an infectious disease consult, and a craniectomy, whereby doctors removed a part of his skull. And on September 13, doctors decided to extract tooth number nine from Deen's mouth. It was only after this extraction that one doctor first suggested to Linda Deen that it was the problem tooth that had caused Kenneth Deen's rapid and dramatic medical decline.

Deen was discharged from the hospital in December of 2005. He could move both of his arms, but his lower mobility was extremely limited: "He could lift his legs very little up off of his bed and he would try to push them out. You could see he was trying but he was not capable of getting them to move outward." He could recognize people, he could smile, he could follow commands, he was

5

able to communicate, but he could only say one word.  Over the coming months and years, Deen moved from nursing home to nursing home, where he underwent physical therapy, occupational therapy, and speech therapy, all with varying degrees of success.

Linda Deen sued several of Kenneth Dean's treating physicians and the hospital on August 13, 2007.  During discovery for that case, Linda Deen obtained, for the first time, "specific medical information to confirm that the infected tooth was the cause of Kenneth's subdural empyema and resulting brain damage."

B.

On March 21, 2008, Linda Deen, alleging diversity jurisdiction, sued Dr. Egleston in the United States District Court for the Southern District of Georgia. She did so individually and as next friend of her husband.[1]  The suit alleged professional medical malpractice arising from Kenneth Deen's visits to Gentle Dental on July 18 and August 4, 2005.  Linda Deen claimed that Dr. Egleston had been medically negligent by, among other things, performing a full mouth debridement which, according to Deen, "caused huge amounts of bacteria to have

---

[1] Georgia law provides that, "[i]f an infant or incompetent person does not have a duly appointed representative, he may bring an action by his next friend or by a guardian ad litem." O.C.G.A. § 9-11-17(c).  Sadly, during the pendency of this action, Kenneth Deen died.  Linda Deen, therefore, appears before this Court individually and as temporary administrator of the estate of Kenneth Deen.  See Fed. R. Civ. P. 25(a)(1).

We note separately that Kenneth Deen's April 2009 death is not at issue in this case.

6

been dumped into the blood stream." She sought compensatory damages and damages for pain and suffering and loss of consortium. She alleged damages in excess of $10,000. An amended complaint followed, adding counts for negligence per se, simple negligence, and constructive fraud.

Dr. Egleston moved for summary judgment, arguing, among other things, that the medical malpractice claim was barred by Georgia's two-year statute of limitations for actions in medical malpractice. The alleged malpractice occurred on either July 18 or August 4, 2005, but the lawsuit was not filed until March 21, 2008, more than two years later.

On February 13, 2009, the district court granted in part and denied in part the motion for summary judgment. As an initial matter, the court asserted subject matter jurisdiction over the case, even though Deen had pled only $10,000 in controversy, because "it appear[ed] that substantially more than $75,000 [was] at stake in this litigation." Deen v. Egleston, 601 F. Supp. 2d 1331, 1334 (S.D. Ga. 2009). The district court then proceeded to grant the motion as to the claims of simple negligence, negligence per se, and constructive fraud. Id. at 1347. The court, however, held the statute of limitations unconstitutional as applied to Deen. Id.

The district court first reviewed Georgia's legislative scheme, noting that the

mentally incompetent are usually entitled to tolling of the statute of limitations, but that there is no tolling for the mentally incompetent in medical malpractice. See id. at 1340. It then applied what it claimed to be rational basis review, though there is some indication that the court was applying some sort of heightened standard. See id. at 1342, 1343. It concluded that the legislative scheme violated the Equal Protection Clause.

The court stated that none of the recited legislative objectives was served by denying the mentally incompetent the benefits of tolling in cases of medical malpractice, see id. at 1344-45, and that there was no rational basis for treating the mentally incompetent differently from those asserting medical malpractice suits under the foreign object rule, those making contribution claims, or those who had been killed by medical malpractice, see id. at 1345-46. It concluded that the legislation "rests on an 'irrational prejudice' against the mentally incompetent." Id. at 1346 (quoting City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 450 (1985)).

The district court certified the case for interlocutory appeal, see id. at 1347, and a panel of this Court granted Egleston's subsequent petition to appeal under 28 U.S.C. § 1292(b), see Order at 1, Egleston v. Deen, No. 09-90006-H (11th Cir. Mar. 24, 2009). This timely appeal followed. Deen later filed a cross-appeal,

8

which this Court dismissed.  See Order at 1, Deen v. Egleston, No. 09-11458-FF (11th Cir. Aug. 14, 2009).

## II.

"We review a district court's grant or denial of summary judgment de novo, considering all the facts and reasonable inferences in the light most favorable to the nonmoving party."  Norfolk S. Ry. Co. v. Groves, 586 F.3d 1273, 1277 (11th Cir. 2009).  Under Rule 56 of the Federal Rules of Civil Procedure, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  We review the constitutionality of a challenged statute de novo as well.  Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009).

"[A] diversity suit should not be dismissed unless 'it is apparent, to a legal certainty, that the plaintiff cannot recover [the requisite amount in controversy].'"  Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1268 (11th Cir. 2000) (second alteration in original) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938)).

A.

In answering the constitutional question before us, we begin by carefully considering the statutes of limitations and tolling provisions in operation in the state of Georgia. Of particular relevance to our discussion today is the two-year statute of limitations for medical malpractice actions: "Except as otherwise provided in this article, an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred." O.C.G.A. § 9-3-71(a).

In Georgia, there are a pair of tolling provisions that apply generally to the legally incompetent. The first protects the legally incompetent from injuries occurring during the period of legal incompetence: "Minors and persons who are legally incompetent because of mental retardation or mental illness, who are such when the cause of action accrues, shall be entitled to the same time after their disability is removed to bring an action as is prescribed for other persons." Id. § 9-3-90(a). The second protects those whose legal incompetence takes hold after a cause of action has accrued: "If any person suffers a disability specified in Code Section 9-3-90 after his right of action has accrued and the disability is not voluntarily caused or undertaken by the person claiming the benefit thereof, the limitation applicable to his cause of action shall cease to operate during the

10

continuance of the disability." Id. § 9-3-91.

Tolling under Georgia law, however, works very differently in cases of medical malpractice. Notably, tolling is unavailable for the legally incompetent in cases of medical malpractice: "Notwithstanding Article 5 of this chapter, all persons who are legally incompetent because of mental retardation or mental illness and all minors who have attained the age of five years shall be subject to the periods of limitation for actions for medical malpractice provided in this article." Id. § 9-3-73(b).

But there is tolling under Georgia law for other medical malpractice plaintiffs. First, medical malpractice cases arising under the foreign object rule enjoy the benefit of tolling, id. § 9-3-73(e) ("The limitations of subsections (b) and (c) of this Code section shall not apply where a foreign object has been left in a patient's body."), but such actions must be brought within one year of discovery, id. § 9-3-72 ("The limitations of Code Section 9-3-71 shall not apply where a foreign object has been left in a patient's body, but in such a case an action shall be brought within one year after the negligent or wrongful act or omission is discovered."). Second, the tolling provisions that apply to unrepresented estates, id. § 9-3-92 ("The time between the death of a person and the commencement of representation upon his estate or between the termination of one administration and

11

the commencement of another shall not be counted against his estate in calculating any limitation applicable to the bringing of an action, provided that such time shall not exceed five years."), trump the medical malpractice non-tolling provisions, Goodman v. Satilla Health Servs., Inc., 658 S.E.2d 792, 794 (Ga. Ct. App. 2008).[2] Third, and finally, under the rules of contribution, see O.C.G.A. § 51-12-32(b) ("If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution."), the defendant in a medical malpractice suit may sue an adjudicated joint-tortfeasor for contribution after the medical malpractice statute of limitations has run, Va. Ins. Reciprocal v. Pilzer, 599 S.E.2d 182, 183 (Ga. 2004).

In short, under Georgia law, the statute of limitations for actions in medical malpractice is two years. The legally incompetent are generally permitted to toll actions until their legal incompetence passes, but may not toll in cases of medical malpractice. Nevertheless, three discrete categories of parties -- foreign object plaintiffs, unrepresented estates, and contribution claimants -- may toll their medical malpractice actions.

The Georgia legislature codified its rationale for the tolling provisions in

---

[2] "[W]e may rely on the interpretation of a state's intermediate courts absent some indication from the state's highest court to the contrary." Myers v. Cent. Fla. Invs., Inc., — F.3d —, 2010 WL 20987, at *11 n.5 (11th Cir. Jan. 6, 2010).

cases of medical malpractice.  It explained:

> The findings of the General Assembly under this Code section include, without limitation, that a reasonable relationship exists between the provisions, goals, and classifications of this Code section and the rational, legitimate state objectives of providing quality health care, assuring the availability of physicians, preventing the curtailment of medical services, stabilizing insurance and medical costs, preventing stale medical malpractice claims, and providing for the public safety, health, and welfare as a whole.

O.C.G.A. § 9-3-73(f).  We proceed, then, with the express understanding that Georgia has fashioned its statutes of limitations regarding medical malpractice in an attempt to ensure to its citizens affordable access to quality healthcare, and that one part of this effort is to stem what it perceived as the filing of stale medical malpractice suits.

B.

The Fourteenth Amendment of the federal Constitution states: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. xiv, cl. 1.  This statement "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216, (1982)).  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  Id. at 440 (citing Schweiker v. Wilson, 450 U.S. 221,

13

230 (1981) (additional citations omitted)). "This standard is easily met." Leib v. Hillsborough County Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009).

This is called rational basis review, and affords states "wide latitude" when crafting "social or economic legislation." City of Cleburne, 473 U.S. at 440 (citing U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 174 (1980)) (additional citation omitted). State legislatures are afforded this discretion because it is the job of the states themselves, acting through "democratic processes," to rectify "improvident decisions." Id.; see also FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.") (citation and quotation marks omitted).

"The equal protection obligation imposed by the Due Process Clause of the Fifth Amendment is not an obligation to provide the best governance possible." Schweiker, 450 U.S. at 230. Because it is fundamentally the people who are empowered to overturn unwise social and economic laws, the role of the judiciary is accordingly limited: "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Beach Commc'ns, 508 U.S. at 313. Rather, courts passing on social and economic legislation must exercise

14

restraint: "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id.; see also City of Cleburne, 473 U.S. at 441-42 (noting that federal courts should be "very reluctant . . . to closely scrutinize legislative choices as to whether, how, and to what extent" state economic and social interests should be pursued). Courts, ultimately, are looking for "plausible reasons" for legislative action. Beach Commc'ns, 508 U.S. at 313-14 (citation omitted).

We recognize that the rational basis inquiry is "not a toothless one," Schweiker, 450 U.S. at 234 (citation and quotation marks omitted), and there are limits to the latitude afforded states. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives -- such as a bare . . . desire to harm a politically unpopular group -- are not legitimate state interests." City of Cleburne, 473 U.S. at 446-47 (quotation marks and citation omitted). Nevertheless, as this Court stated last year,

> under rational basis review, a state has no obligation to produce evidence to sustain the rationality of a statutory classification. Rather, a statute is presumed constitutional, and the burden is on the one attacking the law to negate every conceivable basis that might support

15

it, even if that basis has no foundation in the record. Under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends.

Leib, 558 F.3d at 1306 (quotation marks and citations omitted).

C.

There is some question in this case as to what standard of review the district court applied. While in some instances the court professed to apply rational basis review, see, e.g., Deen v. Egleston, 601 F. Supp. 2d 1331, 1343 (S.D. Ga. 2009) ("To withstand rational basis review, legislation that discriminates against the mentally incapacitated must be rationally related to a legitimate government purpose."), at other times the court seemed to require something more, see, e.g., id. ("The Supreme Court . . . demonstrated in Cleburne that the courts should undertake a robust, searching form of rational basis review where the challenged law discriminates against the mentally incapacitated.").

As we've noted already, however, social and economic policy is generally subject to rational basis review. Beach Commc'ns, 508 U.S. at 313. Indeed, City of Cleburne itself disavowed any heightened standard for legislation reaching the mentally retarded:

Because mental retardation is a characteristic that the government may legitimately take into account in a wide range of decisions, and because both State and Federal Governments have recently committed themselves to assisting the retarded, we will not presume that any

16

given legislative action, even one that disadvantages retarded individuals, is rooted in considerations that the Constitution will not tolerate.

City of Cleburne, 473 U.S. at 446. We, therefore, apply rational basis review to our examination of this legislation, and to the extent that the district court applied scrutiny in excess of that standard, it was error.

The district court, after quoting from Georgia's legislative goals, acknowledged that "[e]nsuring access to affordable healthcare is a legitimate legislative objective." Deen, 601 F. Supp. 2d at 1343-44. We agree. Nevertheless, the district court went on to say that Georgia's "aim is not reasonably furthered by discriminating against incapacitated adults' medical malpractice claims." Id.

The court then entered into an extensive discussion of the failures of tort reform. It wrote:

> Experience and experimentation in the states has shown that medical malpractice lawsuits are not a major driver of skyrocketing healthcare costs. The Court doubts whether medical malpractice lawsuits were ever a real part of the healthcare problem, with respect to rising costs, in this country. The impetus behind the special legislation for medical malpractice cases appears to have been based on either misunderstanding of the problem of healthcare expenses, or an outright boondoggle. Although medical malpractice suits have been stifled, healthcare costs continue to soar. If malpractice lawsuits were a problem in limiting affordable, quality healthcare at one time, the facts no longer support the idea that lawsuits remain part of the problem. Study after study shows malpractice costs as averaging

17

around one percent of healthcare costs, but expenses continue to rise at an alarming rate.

Id. at 1344. (citations omitted). The district court later observed, "[m]alpractice costs make up about one percent of healthcare costs, and claims brought by incapacitated persons beyond the limitations period make up an extremely small proportion of all malpractice claims." Id. at 1345. Therefore, it concluded that limiting medical malpractice suits could bear no rational relationship to the legitimate state interest in providing quality healthcare.

Others disagree. In fact, numerous courts have discussed at considerable length how limiting malpractice actions is indeed rationally related to the goals of improving healthcare. The Ninth Circuit, for example, reasoned that, out of a concern for fairness towards doctors, statutes of limitations are an appropriate way to limit liability. It said, "essential justice requires prevention of the imposition of liability upon physicians who, because of the passage of time, have become disempowered to present meritorious defenses. At some point in time, claims must be held to have become barred." Owens v. White, 380 F.2d 310, 315 (9th Cir. 1967). A weak statute of limitations, the court reasoned,

> would subject physicians to the possibility of liability, or at least to the embarrassment and expense of litigation, upon claims of mistaken diagnosis of any illness, however great may have been the lapse of time between the date of cessation of the doctor-patient relationship and the formal prosecution of the claim.

18

Id. at 316.  The court further noted that medical malpractice, as opposed to other

forms of negligence, was particularly suited to a hardy statute of limitations:

> Even in its present stage of advanced development, medicine is not an exact science.  Symptoms and diseases thought at one time, even recently, to fall into one category are later discovered, through the evolution of the science, to fall into another.  If the trier of fact should be convinced, upon the basis of new knowledge, that a mistaken diagnosis was made, the defendant's task of establishing that his conduct did not fall below the standard of care which prevailed in his profession at the time and place of the alleged error could prove insurmountable in the event of sufficient lapse of time.

Id.  The Ninth Circuit reasoned that a weak statute of limitations would subject

doctors to stale, indefensible claims in which injury is unclear and the duty of care

ever-shifting.

The Eighth Circuit has reached a similar conclusion.  See Fitz v. Dolyak,

712 F.2d 330, 333 (8th Cir. 1983) ("[T]he purpose of statutes of limitation is to

prevent fraudulent and stale actions from arising after a great lapse of time while

preserving for a reasonable period the right to pursue a claim.").  The Seventh

Circuit, for its part, focused on the effects of medical malpractice suits on liability

insurance:

> Creating a shorter period of limitations in which to commence actions against health care providers is clearly a rational legislative response to the fiscal uncertainties in the health care industry.  The ability to commence an action at an indefinite time in the future would no doubt prevent insurance companies from accurately computing the actuarial

19

risk of future claims and compound the escalation of medical costs. Although the Act does contain a $500,000 cap per injury which serves to limit liability for each incident, the statute of limitations serves to limit the number of potential claims outstanding.

Douglas v. Hugh A. Stallings, M.D., 870 F.2d 1242, 1248 (7th Cir. 1989). If insurance companies have to weigh the costs of defending decades-old suits, the court reasoned, then it would become more difficult for them to provide doctors with insurance, which in turn leads to lesser care.

Perhaps the strongest statement on the subject has come from the Supreme Court of Maine. It wrote:

A statute of limitation, by definition arbitrary, is enacted to provide potential defendants with the assurance of eventual repose from claims made stale by the passage of time. It is of necessity a potent element in any reform of tort law. We have heretofore recognized that "[t]he production of evidence and records necessary to meet [medical] malpractice claims becomes progressively more difficult with time." As a court, we must assume that [the statute of limitations] represents the Legislature's considered judgment concerning the most effective manner of decreasing the premium costs of medical professional liability insurance.

Maine Med. Ctr. v. Cote, 577 A.2d 1173, 1176-77 (Me. 1990) (citations omitted) (first and second alterations in original). Here, the critical point is that the passage of time, more so with medical malpractice than with other forms of negligence, renders a defense more difficult.

The themes these courts have sounded are forceful and consistent.

20

Defending law suits is hard; defending malpractice suits is harder; and defending old malpractice suits is harder still. These courts have reasonably concluded that being forced to defend stale malpractice suits increases the cost of liability insurance and renders the practice of medicine that much more expensive. Moreover, the rationales offered by these courts dovetail with the rationales offered by the state of Georgia: providing quality care, ensuring that there are enough doctors and medical services, stabilizing the market for medical insurance, barring old claims, and generally promoting public safety, health, and welfare.

We express no opinion in the ongoing debate over healthcare reform. We do not determine whether medical malpractice lawsuits are a significant driver of rising healthcare costs, nor whether tort reform has proven effective at improving access to quality care. We do not consider these matters because, in order to resolve the case before us, we do not have to. Rather, it is quite enough to note the existence of a viable, ongoing debate, and determine that Georgia's approach to a particularly thorny legislative problem -- embodied in its statutes of limitations -- is rational. What the district court did was wade far too deeply into the debate. There are powerful arguments on both sides of the issue, and it is for the legislature to weigh them and decide on that course which is most prudent. It is not the province of the federal courts to substitute their personal notions of sound public

policy for those chosen by the legislature.

The district court offered alternative grounds for its holding as well, reasoning that the differential treatment of the legally incompetent, foreign object plaintiffs, unrepresented estates, and contribution claimants violated equal protection. See Deen, 601 F. Supp. 2d at 1345-46. Yet we again conclude that the actions of the Georgia legislature were reasonable.

As the district court noted, many states have considered whether it is reasonable to treat foreign object plaintiffs differently from other medical malpractice claimants. The Supreme Court of Arizona, for instance, lambasted such laws. It said:

> The act under consideration abolishes the discovery rule for many types of claims against health care providers, no matter how meritorious the claim. It is difficult to find a compelling or even legitimate interest in this. It may be argued, of course, that the high premiums in malpractice cases work an economic hardship on physicians and that, therefore, the special statute of limitations should be sustained as a necessary "relief measure" for health care providers. We doubt the factual premise for such an argument. More importantly, however, we believe that the state has neither a compelling nor legitimate interest in providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system.

Kenyon v. Hammer, 688 P.2d 961, 976 (Ariz. 1984).[3] The Supreme Court of

---

[3] We note briefly, although it goes without saying, that the opinions of state supreme courts do not bind us on questions of federal constitutional law. Cf. World Harvest Church, Inc. v. Guideone Mut. Ins. Co., 586 F.3d 950, 957 (11th Cir. 2009) ("When we address issues of state

22

Colorado spoke out similarly against these internal distinctions:

> [T]he two exceptions created by the legislature also manifest a governmental interest in preserving medical malpractice claims where the claimant has sustained an injury but lacks any reasonable opportunity to discover the act or omission which caused the injury. The classification which results in the denial of the discovery rule to patients whose conditions are negligently misdiagnosed does not further this legitimate governmental interest and, therefore, lacks a rational relationship to that goal.

Austin v. Litvak, 682 P.2d 41, 50 (Colo. 1984). Other courts have echoed this reasoning. See Carson v. Maurer, 424 A.2d 825, 833 (N.H. 1980), overruled on other grounds by Cmty. Res. for Justice, Inc. v. City of Manchester, 917 A.2d 707 (2007) ("[T]he [discovery] rule and the fundamental equitable considerations underlying it appl[y] to medical malpractice cases generally. As such, the legislature may not abolish the discovery rule with respect to any one class of medical malpractice plaintiffs."); Frohs v. Greene, 452 P.2d 564, 565 (Or. 1969) ("On a theoretical basis it is impossible to justify the applicability of the discovery rule to one kind of malpractice and not to another."); Yoshizaki v. Hilo Hospital, 433 P.2d 220, 223-24 (Haw. 1967) ("The injustice of barring the plaintiff's action before she could reasonably have been aware that she had a claim is patent.");

law, . . . we are bound by the decisions of the state supreme court."). Moreover, the state cases we have discussed arise under different factual and legal circumstances. For instance, Kenyon v. Hammer, which was decided on state grounds, see 688 P.2d 961, 963 (Ariz. 1984), subjected the relevant legislation to strict scrutiny, see id. at 975. Nevertheless, we recite the arguments here to the extent that they have bearing on the question of rational basis review we confront.

23

<u>Warrington v. Charles Pfizer & Co.</u>, 80 Cal. Rptr. 130, 133 (Ct. App. 1969).

But the fact that these courts believe that a legislative scheme is arbitrary does not make it so. We are again faced with the question of legislative balancing for which there exist strong arguments on both sides. In fact, the Supreme Court of Georgia has expressed its belief that the very legislative scheme we consider today is perfectly rational. In <u>Allrid v. Emory University</u>, the court acknowledged the scheme "to be an extremely harsh limitation in application because it has the effect, in many cases, of cutting off rights before there is any knowledge of injury." 285 S.E.2d 521, 524 (Ga. 1982). Nevertheless, it concluded that the Georgia legislature had a sound reason for the purported inconsistency:

> [W]hen a physician places a foreign object in his patient's body during treatment, he has actual knowledge of its presence. His failure to remove it goes beyond ordinary negligence so as to be classified by the legislature as a continuing tort which tolls the statute of limitations until the object is discovered. The purpose of the legislature in making a distinction between the two types of medical malpractice was to allow the plaintiff's claim which does not rest on professional diagnostic judgment or discretion to survive until actual discovery of the wrongdoing. In such situations the danger of belated, false or frivolous claims is eliminated.

<u>Id.</u> at 524-25 (quoting <u>Dalbey v. Banks</u>, 264 S.E.2d 4, 5 (Ga. 1980)). The court's statement that the state legislature had a legitimate purpose in enacting this legislative scheme is well-taken. And, as Dr. Egleston notes, Georgia is not alone in this view. <u>See</u> <u>Fitz v. Dolyak</u>, 712 F.2d 330, 333 (8th Cir. 1983) ("In contrast to

24

the propriety of a diagnosis or adequacy of treatment, the presence or absence of foreign objects inadvertently left in the body may be easily verified after the passage of time."); Choroszy v. Tso, 647 A.2d 803, 808 (Me. 1994) ("The distinction between foreign-object plaintiffs and other medical malpractice victims can be justified on an evidentiary basis; finding the object in the plaintiff's body provides irrefutable evidence of negligence."); Hawley v. Green, 788 P.2d 1321, 1324 (Idaho 1990); Hanflik v. Ratchford, 848 F.Supp. 1539, 1546 (N.D. Ga. 1994) ("Plaintiffs have directed this Court's attention to nothing that would indicate that the Georgia General Assembly's studied choice, made in a context in which all interested parties were able to contribute, was irrational.").

The justification offered by the Georgia Supreme Court in Allrid is defensible and rational, and that is all that the law requires. It is highly unlikely that a litigant will attempt to game the foreign object rule, whereas a broader discovery rule, which would toll the statute of limitations for the legally incompetent, could be manipulated more easily by plaintiffs. Again, plaintiffs bear the burden of "negat[ing] every conceivable basis" for legislation, see Leib, 558 F.3d at 1306, and Deen cannot do that here.

For similar reasons, the state of Georgia has a rational basis for distinguishing between the legally incompetent on the one hand and unrepresented

25

estates on the other. Injury in medical malpractice cases can be difficult to detect,

particularly after the passage of time. See Owens v. White, 380 F.2d 310, 316 (9th

Cir. 1967) ("[N]ot even the fact of injury can always be clear."). Courts and

legislatures are unquestionably concerned about "false [and] frivolous claims," see

Allrid v. Emory Univ., 285 S.E.2d 521, 525 (Ga. 1982), and negligence is "more

easily verified" when a patient dies, cf. Fitz v. Dolyak, 712 F.2d 330, 333 (8th Cir.

1983) ("In contrast to the propriety of a diagnosis or adequacy of treatment, the

presence or absence of foreign objects inadvertently left in the body may be easily

verified after the passage of time."); Choroszy v. Tso, 647 A.2d 803, 808 (Me.

1994) ("The distinction between foreign-object plaintiffs and other medical

malpractice victims can be justified on an evidentiary basis; finding the object in

the plaintiff's body provides irrefutable evidence of negligence."). Simply put, a

legislature may rationally treat an unrepresented estate differently from a mentally

incompetent person for precisely the same reasons that it may treat a foreign object

plaintiff differently: the likelihood of falsity and frivolity is reduced.

We find persuasive the reasoning of the Ninth Circuit, which recently

considered an Oregon statute of limitations that also distinguished between

unrepresented estates and other claimants. The court explained the issue this way:

> George Fields argues that the Oregon wrongful death statutes of
> limitations and repose violate equal protection because they

26

> impermissibly discriminate between claimants whose decedents happen to live for more than three years after discovering the injury causing the death and five years of sustaining the injury causing death, as in Laura's case, and claimants whose decedents die within three years of discovering the injury causing death and five years of sustaining the injury causing death.

Fields v. Legacy Health Sys., 413 F.3d 943, 955 (9th Cir. 2005). The court rejected an equal protection challenge, reasoning that barring the suits of living claimants, while permitting the suits of dead claimants, withstood rational basis review: "the classifications made in the Oregon statutes of limitations and repose are rationally related to the legitimate legislative ends of avoiding stale claims and limiting the costs of litigation and medical care." Id. We agree with this reasoning, and conclude that Georgia's distinction between the legally incompetent and unrepresented estates is rational as well.

As for contribution claims, the clear language of the statute itself establishes that negligence is not at issue in a claim for contribution: "If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution." O.C.G.A. § 51-12-32(b). Moreover, the Supreme Court of Georgia has made it clear that a contribution claim against a medical professional may only survive the medical malpractice statute of limitations if the third-party defendant has already been found liable: "In a claim for contribution based on a judgment, the tort liability has been established, so [defendant's]

27

liability in this action depends not on proof she was negligent, but on the existence of the judgment against her and the payment by the plaintiff of more than the plaintiff's share." Va. Ins. Reciprocal v. Pilzer, 599 S.E.2d 182, 183 (Ga. 2004).

In fact, the Supreme Court of Georgia explicitly noted that the statute of limitations for contribution claims would not permit a defendant to sue a third-party defendant on a theory of contribution if that third party defendant had not already been found liable:

> Those cases differ from the present case in that this action is based on a judgment conclusively establishing joint tort liability whereas the cited cases were based on the alleged but undetermined joint tort liability of the defendants. Here, the plaintiff and the defendant in the contribution action were adjudicated to be joint tortfeasors in the underlying tort action while the defendants in the cited cases had not been, and the plaintiffs there were required to establish that the defendants were joint tortfeasors with the plaintiffs.

Id. Rather, a claim for contribution rests on a prior finding of liability and a judicial determination of damages. See id. Because the nature of the proof in a claim for contribution is so vastly different from that in a medical malpractice suit, there is a rational basis for distinguishing between the two classes of plaintiffs.

A contribution claim among joint tortfeasors can hardly be said to increase the exposure of the medical community to malpractice damages. A claim for contribution filed by one medical professional against another merely apportions losses among the liable in a manner adjudicated to be equitable; it does not provide

28

an additional means for liability.  While the contribution rule will assuredly disfavor some medical professional someday, it does not increase the exposure for the industry.

Even allowing a claim for contribution brought by a non-medical professional against a medical professional does not undermine the state's goals of tort reform.  Cf. Zielinski v. Zappala, 470 F. Supp. 351, 354 (E.D. Pa. 1979) (holding that a non-medical professional need not arbitrate a claim for contribution against a surgeon, despite a strong state interest in tort reform and a statute requiring arbitration for claims of malpractice).  The state can have no legitimate interest in forcing non-medical professionals to pay for behavior of medical professionals who are adjudicated negligent; not even the staunchest supporter of tort reform would suggest otherwise.

While allowing that these contribution claims might force a doctor or a dentist to pay for stale negligence claims, it would never force a doctor or dentist to defend against the same.  See Pilzer, 599 S.E.2d at 184 ("[L]iability here does not depend on proof of . . . negligence.").  And it is the defense of stale claims with which legislators are concerned.  See, e.g., Owens v. White, 380 F.2d 310, 315 (9th Cir. 1967) ("[E]ssential justice requires prevention of the imposition of liability upon physicians who, because of the passage of time, have become disempowered

29

to present meritorious defenses."). The state of Georgia has rational reasons, therefore, to allow a claim for contribution to outlive the statute of limitations for medical malpractice claims.

D.

Finally, Deen argues that Georgia employs this legislative scheme in order to improperly favor some parties over others. She cites to Kenyon v. Hammer, 688 P.2d 961 (Ariz. 1984), which offered an impassioned denunciation of the type of legislative scheme we examine today. The Arizona court said:

> [T]he state has neither a compelling nor legitimate interest in providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system. If such a hypothesis were once approved, any profession, business or industry experiencing difficulty could be made the beneficiary of special legislation designed to ameliorate its economic adversity by limiting access to the courts by those whom they have damaged. Under such a system, our constitutional guarantees would be gradually eroded, until this state became no more than a playground for the privileged and influential.

Id. at 976.

The argument goes too far. Statutes of limitations, according to the Supreme Court, represent "a public policy about the privilege to litigate." Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314 (1945). As the Court explained in detail,

> Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the

30

courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. . . . He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

Id. (internal citation and footnote omitted).

Legislatures, in other words, always choose who may have access to court. The question is whether such choice is rationally related to legitimate objectives. See Leib v. Hillsborough County Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009). We consider this question with due appreciation for the difficulty that is legislative line-drawing. As Justice Holmes wrote long ago,

When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

Louisville Gas Co. v. Coleman, 277 U.S. 32, 41 (1928) (Holmes, J., dissenting). Deen has failed to show that Georgia's actions are wide of the mark.

31

Moreover, the legislative scheme does not evince any animus towards the mentally retarded, as the district court suggested. See Deen v. Egleston, 601 F. Supp. 2d 1331, 1346 (S.D. Ga. 2009). The Georgia laws this Court must evaluate refer generally to the "legally incompetent because of mental retardation or mental illness." O.C.G.A. §§ 9-3-90(a), 9-3-73(b). This includes the mentally retarded, the mentally ill, and those who are incapacitated by the very negligence alleged in the suit. See Kumar v. Hall, 262 Ga. 639, 643 (1992). This stands in stark contrast to the legislation that was struck down in City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 450 (1985), which contemplated those whom it termed the "feeble-minded," id. at 436. The mere inclusion of the mentally retarded in the statute's definition of the legally incompetent does not suggest that animus towards the retarded motivated the statute.

The Georgia legislature, concerned about the proliferation of medical malpractice suits and their adverse impact on the quality of healthcare, is lawfully permitted to fashion "a partial solution to a far more general problem." Schweiker v. Wilson, 450 U.S. 221, 238 (1981). And it is not for this Court to substitute its judgment for that of the Georgia legislature. Quite simply, there is a rational basis underlying Georgia's legislative scheme. Accordingly, we REVERSE the partial denial of summary judgment of the district court and REMAND for further

32

proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.