[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15900
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-01277-JOF


DENISE DEMAREE,
MEGAN HUMPHREYS,
ALLISON JONES,
CLARE MANSELL,
MARY MCCOY,
TIM MCKINNEY,
MIKE MITCHELL,
JANET STALLING,
RAY SPLAWN,
SANDY WADE,

                        Plaintiffs - Appellants,

versus

FULTON COUNTY SCHOOL DISTRICT,

                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 8, 2013)

Before MARCUS, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Plaintiffs-Appellants Denise Demaree, Megan Humphreys, Allison Jones, Clare Mansell, Mary McCoy, Tim McKinney, Mike Mitchell, Janet Stalling, Ray Splawn, and Sandy Wade, elementary school orchestra and band teachers, appeal from the district court's final order dismissing their suit against the Fulton County School District ("School District").  Plaintiffs' complaint alleged that the School District violated their rights (and those of about 40 others) under the Equal Protection Clause of the United States and Georgia Constitutions when the teachers lost their jobs during a reduction in force ("RIF") implemented by the School District in 2010.  On appeal, Plaintiffs argue that the district court erred in holding that: (1) there was a rational basis for the School District's different treatment of Plaintiffs and all other employees; (2) the exception to the application of non-mutual offensive collateral estoppel delineated in United States v. Mendoza, 464 U.S. 154 (1984), extended to the School District; and (3) the equal protection issue was not "actually litigated" in Lee v. Fulton County Board of Education, 2010-CV-193987 (Ga. Sup. Ct. 2011).  After thorough review, we affirm.

We review a judgment on the pleadings de novo.  Cannon v. City of W. Palm Beach, 250 F.3d 1299, 1301 (11th Cir. 2001).  "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is

entitled to judgment as a matter of law." Id. We may affirm the district court's judgment on any ground that the record supports. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001).

The relevant allegations, for purposes of the motion for judgment on the pleadings, are these. Plaintiffs were employed by the School District as elementary instrumental (band and orchestra) music teachers during the 2009-2010 school year. Plaintiffs' teaching contracts were all non-renewed at the conclusion of the 2009-2010 school year, as the result of a RIF instituted by the Fulton County Board of Education in the spring of 2010. The RIF described a five-step analysis considering factors of performance and tenure. The first step eliminated employees who did not have tenure and who had performance issues. Each step in the process went further into non-tenured and tenured positions, culminating in the fifth step which eliminated employees based on tenure if not enough positions were eliminated by the first four steps.

The positions of elementary orchestra and band school teachers, however, were not eliminated through this five-step analysis. Instead, the School District voted to non-renew all elementary band and orchestra teachers because those positions were deemed "non-essential" functions. These positions were described as "programs/functions eliminated." The non-renewal of the elementary school band and orchestra teachers reduced the School District staff by 54 positions.

3

One group besides elementary orchestra and band teachers was also placed in the "programs/functions eliminated" -- Grades 1 through 3 paraprofessionals. However, the 165 Grades 1 through 3 paraprofessionals were not eliminated as a group like the elementary orchestra and band teachers; rather, they were analyzed through the five-step RIF process. This resulted in some of the Grades 1 through 3 paraprofessionals' continued employment in other paraprofessional positions. Both the paraprofessionals and the orchestra and band teachers are certified to teach Pre-K through 12th grade.

In this action, Plaintiffs alleged that they were similarly situated with the Grades 1 through 3 paraprofessionals and that the School District had no rational basis for treating the two groups differently. The district court rejected their claims, and this timely appeal follows.

First, we reject the merits of the Plaintiffs' Equal Protection claim. The Fourteenth Amendment of the federal Constitution provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. xiv, § 1. Thus, "all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Id. at 440. "This standard is easily met." Leib v. Hillsborough Cnty.

4

Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009); Deen v. Egleston, 597 F.3d 1223, 1230 (11th Cir. 2010) ("rational review" standard gives states "wide latitude" when crafting "social or economic" legislation).  However, the "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446-47. The Supreme Court has further held that:

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

FCC v. Beach Commc'ns, 508 U.S. 307, 313-14 (1993); see also Panama City Med. Diagnostic, Ltd. v. Williams, 13 F.3d 1541, 1545 (deference must be given to legislature "because lawmakers are presumed to have acted constitutionally despite the fact that, in practice, their laws result in some inequality") (quotation omitted).

On a "rational-basis review" the classification bears a "strong presumption of validity" and a party challenging the classification must "negative every conceivable basis which might support it." Beach Commc'ns, 508 U.S. at 314-15 (quotation omitted).  A legislature need not articulate its reasons for enacting a statute. Id. at 315.  The Court continued:

> Defining the class of persons subject to a regulatory requirement -- much like classifying governmental beneficiaries -- inevitably requires that some persons who have an almost equally strong claim to favored treatment be

5

placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

Id. at 315-16 (quotation omitted).

It is undisputed that the RIF and its application to Plaintiffs does not involve a suspect class or a fundamental right. Therefore, Plaintiffs' claims are analyzed under a rational basis review. The rational basis test asks "(1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it." Lieb, 558 F.3d at 1306. Plaintiffs argue that the School District did not have rational basis for treating the two groups of employees within the RIF's "programs/functions eliminated" differently with regard to which employees would be retained.

However, it is clear that under Georgia law, "teachers" and "paraprofessionals" are treated differently. There are different educational and background requirements for the positions and different protections once an individual is in the position. For instance, teachers have a state-mandated salary scale, are required to have an annual employment agreement, and have certain due process rights if terminated. O.C.G.A. §§ 20-2-212, 20-2-211(b), & 20-2-942. Georgia law defines a paraprofessional as "a person who may have less than professional-level certification . . . and does a portion of the professional's job or

6

tasks under the supervision of the professional, and whose decision-making authority is limited and regulated by the professional." O.C.G.A. § 20-2-204(a)(1). Paraprofessionals are not required to be issued an annual employment agreement, have no state-mandated salary scale, and have no Fair Dismissal Act rights. As the School District also notes, after the RIF, there were no more elementary band/orchestra teaching positions for which Plaintiffs may have been retained, whereas there were remaining elementary paraprofessional positions. Further, no party disputes that each elementary music teacher position eliminated generated a cost savings $68,536 for the School District; while each paraprofessional position saved $27,246. There is also no dispute that the Fulton County School District faced a $140 million budget shortfall which led to the implementation of the RIF.

Based on these circumstances, a multitude of rational bases could be adduced in support of the two groups' differing treatment under the RIF. For example, given that the elementary orchestra and band teachers must have an annual employment agreement and have certain due process rights if terminated, the School District court certainly have found it more efficient to eliminate this group as a whole, without giving them the opportunity to be retained. Paraprofessionals, on the other hand, do not need annual contracts and have no due process rights if terminated, which suggests that rehiring them on an individualized basis might be less involved. Plaintiffs do not rebut these differences.

7

Moreover, since paraprofessionals are supervised, the School District could have found that their transition to other grades would be relatively easy. Elementary orchestra and band teachers, however, as teachers, are not supervised in the same way, and their transition to other kinds of music instruction, or different grades, may not be as easy. Indeed, while Plaintiffs have said that they are certified to teach Pre-K through 12th grade, no where have they mentioned that they could actually easily teach in other positions. Because Plaintiffs have failed to meet their burden of negating "every conceivable basis which might support" the RIF's classification, Beach Commc'ns, 508 U.S. at 315 (quotation omitted), the district court did not err in rejecting their Equal Protection claim.

We also are unpersuaded by Plaintiffs' argument that the School District is collaterally estopped from defending against Plaintiffs' Equal Protection claims due to the decision of the Fulton County Superior Court in Lee. Offensive, non-mutual collateral estoppel is a doctrine under which a plaintiff asserts that a defendant is barred from litigating an issue based on a decision rendered in a case in which the plaintiff was not involved. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327-28 (1979). In Mendoza, 464 U.S. at 162, the United States Supreme Court held that the federal government is not subject to offensive, non-mutual collateral estoppel. We have extended Mendoza to hold that state governments are

not subject to offensive, non-mutual collateral estoppel.  Hercules Carriers, Inc. v. Claimant State of Fla. Dep't of Transp., 768 F.2d 1558, 1579 (11th Cir. 1985).

In Mendoza, the Supreme Court reasoned that government litigation differs significantly from private litigation, and those differences merit exemption from the doctrine.  464 U.S. at 160.  For instance, government litigation frequently involves interpreting the Constitution -- a task often only achieved in government litigation.  Id.  Stifling the litigation of constitutional issues with offensive, non-mutual collateral estoppel would therefore prevent the development and clarification of constitutional law.  Id.  In addition, the government has limited litigation resources, which may dictate litigation strategy.  Id. at 161.  Further, the government creates public policy through litigation, which may justify alternative legal positions.  Id.  The Supreme Court also said that offensive, non-mutual collateral estoppel would frustrate judicial economy because it would force government to vigorously defend every claim to the point of exhaustion to avoid the doctrine, creating more litigation than it alleviates. Id. at 163.

We have likewise held that offensive, non-mutual collateral estoppel does not apply against a state government for many of the same reasons.  Hercules, 768 F.2d at 1579.  In so doing, we recognized the differences in litigation considerations between the government and private litigants, as detailed by Mendoza.  Id. at 1578.  Several district courts in this Circuit have similarly

9

extended <u>Mendoza</u> and <u>Hercules</u> to bar offensive, non-mutual collateral estoppel from applying to local government entities. <u>Tugz Int'l, L.L.C. v. Canaveral Port Auth.</u>, 2005 WL 6046066 (M.D. Fla. 2005); <u>Petchem v. Canaveral Port Auth.</u>, 2005 WL 1862412 (M.D. Fla. 2005).

In <u>Tugz</u>, the district court held that a captain, who wrecked a ship, could not use the administrative law decision, regarding his pilot's license, in litigation against the local port authority. 2005 WL 6046066, at *7. In <u>Petchem</u>, the district court applied <u>Mendoza</u> and <u>Hercules</u>, holding that "whatever differences there may be between the litigation burdens faced by the Port Authority and the federal government or the Port Authority and a state government, they are, in the main, a matter of degree and not of kind." <u>Petchem</u>, 2005 WL 1862412, at *3.[1] The <u>Petchem</u> court further noted that a local government agency, such as a port authority, is likely to be more financially restricted than the federal or state government, making application of the exclusion even more important. <u>Id.</u>

We agree. In the case at hand, excluding a school district from offensive, non-mutual collateral estoppel is based on the same reasoning in <u>Hercules</u> and <u>Mendoza</u>. To begin with, a school district is a political subdivision of the State of

---

[1] In so holding, the court observed that: "there is no basis in this case for concluding that the Port Authority is a state government in the sense contemplated by the court in <u>Hercules Carriers</u> and certainly is, in no sense, the federal government, there is no question that it is a governmental entity." 2005 WL 1862412, at *3. The same is true here of the School District.

10

Georgia.  Greene County School Dist. v. Circle Y Const., Inc., 728 S.E.2d 184, 185 n.2 (Ga. 2012) (noting that a local school system is a political subdivision of the state); accord Thornton v. Clarke County School Dist., 514 S.E.2d 11, 12 n.1 (Ga. 1999).    Additionally, the litigation at hand involves constitutional interpretation; thus, applying offensive, non-mutual collateral estoppel would hinder the court from developing and clarifying essential constitutional law.  It is also true that school districts must sometimes promote educational policy through the courts, which may merit alternative interpretations of a law or case; thus, offensive, non-mutual collateral estoppel would prevent the development of educational policy through litigation.

Most importantly, a school district has a limited litigation budget, much more limited than the federal or state government.  As a result, offensive, non-mutual collateral estoppel would force the school district to spend more on litigation because each claim would have to be utterly exhausted.  Furthermore, this kind of claim exhaustion would actually increase the overall litigation, thus exhausting government resources, instead of promoting judicial economy as estoppel is intended to do.

Plaintiffs argue that offensive, non-mutual collateral estoppel should apply here because unlike a federal or state government, a local government entity is not subject to suit in a vast geographic area, the nature of litigation is more limited, and

11

there is no U.S. Supreme Court certiorari process in place to resolve conflicts amongst the courts. However, as the School District notes, a local government entity may be sued outside of its geographical borders. For example, the School District regularly contracts with vendors from across the country, sends students and employees outside of its borders, and is regularly in situations in which litigation outside of Fulton County could result. As for any difference between the nature of the federal government's litigation and of a local government agency's litigation, it is merely a matter of degree, not kind. Notably, this particular case casts the School District as an employer, but the School District must wear numerous litigation hats ranging from providing special education to local taxation to procurement. As a result, the School District, like the federal and state governments, needs litigation flexibility, so, for example, they are not forced to completely exhaust every administrative hearing, which wastes resources and increases litigation. Finally, given all of the similarities between federal, state and local governments highlighted above, the fact that there is no certiorari process to resolve circuit splits on the local level does not demand application of offensive, non-mutual collateral estoppel.

**AFFIRMED.**

12