[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16788

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 06, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-01583-CV-ORL-31-KRS

FIRST VAGABONDS CHURCH OF GOD,
an unincorporated association,
BRIAN NICHOLS,
ORLANDO FOOD NOT BOMBS,
an unincorporated association,
RYAN SCOTT HUTCHINSON,
BENJAMIN B. MARKESON,
ERIC MONTANEZ,
ADAM ULRICH,

Plaintiffs-Appellees-Cross Appellants,

versus

CITY OF ORLANDO, FLORIDA,

Defendant-Appellant-Cross Appellee,

NATIONAL LAW CENTER ON
HOMELESSNESS & POVERTY,

Amicus.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(July 6, 2010)

Before EDMONDSON, BARKETT and BALDOCK,[*] Circuit Judges.

EDMONDSON, Circuit Judge:

This case is about a local government regulating the manner in which some of its parks are used. We decide whether the City of Orlando's Large Group Feeding Ordinance, as applied to First Vagabonds Church of God and Orlando Food Not Bombs, violates the First and Fourteenth Amendments to the United States Constitution. We also decide whether the ordinance, as applied to First Vagabonds Church of God, violates the Florida Religious Freedom Restoration Act. We conclude that, in the circumstances of this case, the ordinance does not offend the United States Constitution or violate the Florida Religious Freedom Restoration Act. We affirm the district court's judgment in part and reverse it in part. We vacate the district court's permanent injunction that barred enforcement of the ordinance.

_____

[*]Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

2

# I. BACKGROUND

Plaintiff First Vagabonds Church of God is a Christian church; Plaintiff Brian Nichols is the church's pastor.[1] The Church's congregation consists of approximately forty members, most of whom are homeless. Because the Church has no building, Pastor Nichols holds services every Sunday at Langford Park in Orlando. The Church serves food to its members as a part of its religious services.

Plaintiff Orlando Food Not Bombs is a loosely structured organization of political activists who share the view that society has a responsibility to provide food to all of its members; Plaintiffs Ryan Hutchinson, Eric Montanez, Benjamin Markeson, and Adam Ulrich are members of the organization.[2] OFNB conducts food-sharing events at Lake Eola Park, Orlando's signature park, where OFNB provides free food to hungry and homeless persons.

Defendant is the City of Orlando ("the City"). After getting complaints about large numbers of homeless people disbursing from Lake Eola Park into neighborhoods after feeding events, the City enacted the Large Group Feeding Ordinance (the "Ordinance").[3] The Ordinance requires anyone conducting a "large

---

[1]We refer to the church and its Plaintiff-pastor collectively as "the Church."

[2]We refer to the organization and its Plaintiff-members collectively as "OFNB."

[3]A copy of the Ordinance appears in the appendix of this opinion.

3

group feeding" within the Greater Downtown Park District ("GDPD" or "the District") to obtain a permit first.[4] The District is the area within a two-mile radius around Orlando's City Hall and encompasses fewer than half of the City's parks. A "large group feeding" is defined as an "event intended to attract, attracting, or likely to attract 25 or more people, including distributors and servers, in a park or park facility owned or controlled by the City, including adjacent sidewalks and rights-of-way in the GDPD, for the delivery or service of food."[5]

The Ordinance limits the number of permits a person, group, or organization can obtain for a single park within the District to two per consecutive 12-month period. Because both Lake Eola Park and Langford Park are located in the District, the Ordinance affected the activities of both OFNB and the Church. To comply with the Ordinance and continue to serve food in Orlando's parks regularly, both groups will need to rotate their events among the parks in the District or move to a park outside of the District.

In federal court, the Plaintiffs brought six claims against the City. The Church alleged that the Ordinance, as applied to them, violates the Florida Religious Freedom Restoration Act ("FRFRA"), Fla. Stat. § 761.01 et seq., and

---

[4]Violations of the Ordinance are punishable by a fine of up to $500 or 60 days of imprisonment.

[5]The Ordinance excludes the "activities of City licensed or contracted concessionaires, lessees, or licensees" from this definition.

4

that the Ordinance, facially and as applied to them, violates the First Amendment's Free Exercise Clause. OFNB alleged that the Ordinance, both facially and as applied to them, violates the First Amendment's Free Speech Clause.[6] Both Plaintiffs alleged that the Ordinance, facially and as applied to them, violates their rights under the First Amendment's Free Assembly Clause and the Fourteenth Amendment's Due Process and Equal Protection Clauses.[7]

The district court granted the City summary judgment on both the due process and equal protection claims. In its summary judgment order, the district court also rejected OFNB's facial free speech claim because "the conduct regulated by the ordinance is not, on its face, an expressive activity."[8] The district court,

---

[6]Both OFNB and the Church alleged a free speech claim in their complaint; but before trial, the parties filed a joint stipulation clarifying that only OFNB was bringing a free speech claim.

[7]Some confusion exists in this case about whether Plaintiffs also asserted a claim that the City violated their rights to expressive association under the First Amendment. The only reference to a First Amendment right of association in the pertinent Amended Complaint is in the context of a broader, single paragraph in the Facts section. That paragraph states that the City has "deprived Plaintiffs of their constitutional rights to free speech, free assembly and association, free exercise of religion, equal protection under the law and due process." The Amended Complaint's Causes of Action section does not list a cause of action for a violation of the right to expressive association, but does list a cause of action for each of the other constitutional rights at issue in this case. Given the subtlety of how this issue was put to the district court in the pleadings, briefing, and otherwise, the district court did not err in concluding that no expressive association claim was being seriously pressed by the parties; and we will not decide the claim for the first time now on appeal. Cf. Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 972-75 (11th Cir. 2008); Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) ("[D]iscrete claims should be plead in separate counts.").

[8]OFNB does not challenge this determination on appeal.

without a jury, then held a two-day trial on the remaining issues. At the close of the Plaintiffs' case, the City made a motion for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c); the district court declined then to render judgment on that motion.

Shortly after trial, the district court granted the City's Rule 52(c) motion for judgment on the FRFRA claim. Later, the district court entered an opinion and order ruling in favor of the Church on its free exercise claim, in favor of OFNB on its as-applied free speech claim, and in favor of the City on the Plaintiffs' free assembly claims.[9] The district court permanently enjoined the City from enforcing the Ordinance against Plaintiffs. The City appeals the district court's conclusions, after trial, on the free speech and free exercise claims, and the resulting permanent injunction prohibiting the enforcement of the Ordinance against Plaintiffs. Both the Plaintiffs appeal the district court's grant of summary judgment to the City on their due process (void-for-vagueness) claims. The Church appeals the district court's grant of summary judgment in favor of the City on its equal protection claim, as well as the district court's conclusion, under Rule 52(c), that the Ordinance does not violate the FRFRA.

---

[9]Although the Church mentions its free assembly claim in its reply brief, neither Plaintiff discusses that claim in their initial briefs to this court. The issue is therefore abandoned. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 n.1 (11th Cir. 2001).

## II.  DISCUSSION

A.    Free Speech Clause

The City appeals the district court's conclusion that the Ordinance violates the Free Speech Clause, as applied to OFNB; the district court thought that the Ordinance regulates expressive conduct but does not further a substantial government interest.  In the circumstances of this case, the feeding Ordinance regulates no protected expressive conduct; we cannot agree with the district court's decision.

We review the district court's determinations of historical fact for clear error, but review de novo its conclusions of law and determinations of "constitutional fact."  See Flanigan's Enterprises, Inc. of Georgia v. Fulton County, Ga., 596 F.3d 1265, 1275-76 (11th Cir. 2010).  OFNB claims that the Ordinance is unconstitutional because it requires a permit to engage in large group feedings -- conduct which OFNB claims is sufficiently expressive to count as speech under the First Amendment -- and limits the maximum number of permits that a person or organization can obtain to two per year per park.  OFNB wishes to conduct feedings in a single park located in the District more often than the Ordinance will

7

allow.

Conduct that is expressive comes within the First Amendment's protection. See Texas v. Johnson, 109 S. Ct. 2533, 2538 (1989). All conduct is not expressive. Nor is conduct presumptively expressive; the party invoking the First Amendment's protection has the burden to prove that it applies. Clark v. Community for Creative Non-Violence, 104 S. Ct. 3065, 3069 n.5 (1984). To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," we have traditionally asked two things: (1) whether the person seeking the First Amendment's protection had an "intent to convey a particularized message"; and (2) whether "the likelihood was great that the message would be understood by those who viewed it." Johnson, 109 S. Ct. at 2539 (internal quotation marks omitted). A "narrow, succinctly articulable message is not a condition of constitutional protection." Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 115 S. Ct. 2338, 2345 (1995). Instead, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004). This inquiry is an objective one. See id.

Just because the First Amendment does not require expression delivered via conduct to meet a level of specificity or clarity does not mean "that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." See United States v. O'Brien, 88 S. Ct. 1673, 1678 (1968). The First Amendment only protects "inherently expressive" conduct; when conduct is "inherently expressive," it will be "overwhelmingly apparent" to a reasonable observer that he is viewing a form of symbolic speech. See Rumsfeld v. Forum for Academic and Institutional Rights, Inc. ("FAIR"), 126 S. Ct. 1297, 1310-11 (2006). When the objective reasonable observer is deciding whether he is viewing a form of expression, he is given to understand factual context and environment.[10] Spence v. Washington, 94 S. Ct. 2727, 2730 (1974) (prosecution under statute prohibiting flag desecration: hanging a flag upside down, with peace symbols made of tape attached to it on both sides, contemporaneously with the Vietnam War's Cambodian incursion was protected expressive conduct). The observer, however, is deaf and blind to explanatory speech -- T-shirts, buttons, banners, speaking, and so on --  accompanying the conduct. See FAIR, 126 S. Ct. at 1311 ("If combining speech and conduct were

_____

[10]Context and environment mean that the objective reasonable observer has some awareness of current events, common community practices,  the significance of particular locations, and so on. See, e.g., Johnson, 109 S. Ct. at 2536-37, 2540 (burning flag at political demonstration during the Republican National Convention is constitutionally protected).

9

enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it.").

At trial, OFNB asserted that by holding food-sharing events, it intends to convey the message that society can and should provide food for all of its members. The district court determined that OFNB's message is likely to be, and in fact is, understood by the public based on the following things: (1) Orlando's Mayor testified that he personally believed OFNB provided food to the homeless only to convey its political message; (2) in a video presented by OFNB, a police officer noted that he realized that the feeding was being held mainly for political purposes; (3) the testimony at trial established that the likelihood of OFNB's message being received is enhanced by its use of signs, T-shirts, and buttons at the feedings. The district court then concluded that the Ordinance furthers no substantial government interest.

We accept that OFNB had the requisite expressive intent, but we believe that the feedings in this case present at most an ambiguous situation to an objective reasonable observer; the expressive nature of the conduct is not "overwhelmingly apparent." We therefore cannot conclude that the likelihood is great that a reasonable observer would understand OFNB's conduct of simply feeding people

to be truly communicative.[11]

The circumstances underlying the Supreme Court's <u>FAIR</u> decision provide

an apt illustration of conduct that, like the conduct here, is too ambiguous to

---

[11]Because this inquiry is an objective one, the video of the police officer and testimony of the Mayor, relied upon by the district court, are not very helpful.  In some circumstances, evidence about what some people subjectively thought might tend to show what an objective reasonable observer would think.  But this case underscores the potential problem with relying on evidence of an individual observer's subjective impressions.  Here, the district court relied upon video evidence of one police officer commenting on the political nature of the feedings. The video shows this scene: A police officer arrived at a park where a feeding event was occurring and at which several people with cameras (still and video) and other equipment -- some with media insignia -- were present. As the officer entered the park, he was met by the chapter president of the ACLU (who identified himself in just that way).  The Officer commented: "It's really not a big deal.  I understand this is more of a political statement than anything else.  I just need to get the names of the groups."  But the record is devoid of evidence showing <u>why</u> the officer believed that the groups were making a political statement. Did the officer witness food being served and know by that conduct alone that OFNB was attempting to convey a political message?  Did the officer assume it was a political statement because of the presence of media? The ACLU?  Because of the presence of signs, buttons, or special T-shirts?  What information was he given by his supervisors beyond what he saw at the scene?

The testimony of Mayor Dyer likewise does not help us determine whether an objective reasonable person would understand the expressive nature of OFNB's conduct from observing the conduct.  The Mayor testified as follows:

> Q: You have stated publicly that you don't view Orlando Food, Not Bombs, as an organization that does a service for the homeless; is that right?
> A: I don't know what I've said publicly in that regard.  I do not consider them homeless advocates, no.
> Q: You – actually, you believed that Orlando Food, Not Bombs, uses the homeless to serve its political purposes?
> A: That's correct.

This testimony only reflects the Mayor's subjective view of OFNB as an organization and, perhaps, OFNB's intent in participating in the feedings. But the record does not reflect that the Mayor formed this view as a result of just viewing OFNB's conduct of feeding people.

receive constitutional protection as a form of speech. FAIR involved an association of law schools and law faculties that sought "to restrict military recruiting on their campuses because they object[ed] to the policy Congress had adopted with respect to homosexuals in the military." 126 S. Ct. at 1302. Congress reacted to the recruiting restrictions by enacting the Solomon Amendment, which denied federal funds to educational institutions that did not provide military recruiters with access equal to that provided to other recruiters. Id. at 1302.

In FAIR, the schools then claimed, among other things, that the Solomon Amendment prohibited them from engaging in (according to them) expressive conduct: treating military recruiters differently with the intent to show disapproval. Id. at 1310. Before the Solomon Amendment, some "schools 'expressed' their disagreement with the military" by requiring military interviews to take place on the schools' undergraduate campuses when other interviews took place on their law school campuses. Id. at 1310-11. But even though the schools intended to convey a message of disapproval by placing the military recruiters at a different location, the Supreme Court unanimously[12] concluded that the Solomon Amendment did not regulate constitutionally protected expressive conduct. Id. at

_____

[12]Justice Alito took no part in the decision.

12

1311. The conduct was not protected because, unless a school accompanied its act with explanatory speech, "[a]n observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." Id. at 1311.

Like the ambiguous conduct in FAIR, just feeding people in the park is conduct too ambiguous to allow us to conclude that a great likelihood exists that an objective reasonable observer would understand that the feeders are trying to convey a message. Without the assistance of explanatory speech (T-shirts, buttons, banners, and so on), an objective reasonable observer would not know whether the group feeding was a family having a reunion, a church intending to engage in a purely charitable act, a restaurant distributing surplus food for free instead of throwing it away, or an organization trying to engage in a form of political speech. See FAIR, 126 S. Ct. at 1311 ("The expressive component of [the conduct] is not created by the conduct itself but by the speech that accompanies it.").

The district court here noted: "[T]he testimony at trial established that the likelihood of the OFNB Plaintiffs' message being received is enhanced by their use of signs, T-shirts and buttons." We accept that finding, but the explanatory speech

13

is actually "strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." Id. We do not say today that the act of feeding can never, as a matter of law, be sufficiently expressive to receive constitutional protection (this appeal presents an as-applied challenge); but in the circumstances of this case, we are unpersuaded that the conduct of simply feeding people -- the only conduct regulated by the Ordinance -- is expressive for First Amendment purposes.

B.      Free Exercise Clause

The City appeals the district court's conclusion that the Ordinance, as applied to the Church, violates the Free Exercise Clause. The Ordinance is a neutral law of general applicability that serves a rational basis; we cannot approve the district court's conclusion to the contrary.

We review de novo the district court's ultimate conclusion that the Ordinance violates the Free Exercise Clause. See King v. Richmond County, Ga., 331 F.3d 1271, 1275 (11th Cir. 2003). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."

14

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 113 S. Ct. 2217, 2226 (1993). That the Ordinance is neutral and generally applicable in its restrictions on feeding is undisputed; the Ordinance therefore needs only to survive rational basis review. See Combs v. Homer-Center School Dist., 540 F.3d 231, 242-43 (3d Cir. 2008). Under rational basis review, the Ordinance is presumed constitutional. Deen v. Egleston, 597 F.3d 1223, 1230-31 (11th Cir. 2010). The burden is on Plaintiffs to prove that the Ordinance is not rationally related to a legitimate government interest. Id. at 1230. The district court concluded that the Ordinance lacks a rational basis because "[n]one of the legitimate interests proffered by the City are served by [the] Ordinance" and "the Ordinance does much more than incidentally burden Nichols' congregation."[13]

The City contends that the Ordinance furthers its legitimate interest in improved preservation and management of its parks, including distributing among parks and their adjacent neighborhoods the impacts of large group feedings. We accept that the City's asserted interests are legitimate ones for a municipality. See Clark, 104 S. Ct. at 3070 (discussing "the Government's substantial interest in

---

[13]The district court appears to have been mistaken about the meaning of the word "incidental." By definition, neutral laws of general applicability do not more than incidentally burden a religious practice. See 7 Oxford English Dictionary 794 (2d ed. 1989) (defining incidental as "[o]ccurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual"); The Random House Dictionary of the English Language 966 (2d ed. 1987) (defining incidental as "happening or likely to happen in an unplanned or subordinate conjunction with something else").

maintaining the parks . . . in an attractive and intact condition"); Sciarrino v. City of Key West, Fla., 83 F.3d 364, 367-68 (11th Cir. 1996).  Although the district court did not expound on its conclusions in its written order,  the record reveals that the court was unconvinced that distributing the impact of large group feedings to different parks really advanced the legitimate interest; instead of lessening the burden on the City's parks, the district court indicated a belief that the City was just moving the problem around.  And the district court stressed all the potential park-use problems the Ordinance failed to fix.

But it is far from irrational for the City to conclude that an overall reduction in the wear and tear of its park resources will result from rotating the park's frequent large users among all available parks in the District.  Although more effective means might be available to the City to accomplish its goal of park preservation, it is not for federal courts to judge the wisdom or effectiveness of an ordinance on rational basis review; we must uphold the law even if there is an "imperfect fit between means and ends."  See Egleston, 597 F.3d at 1230-31.  Other legitimate grounds might support an ordinance like this one, but just one such ground will do.  The Ordinance does not fail the rational basis test.


C.      Fourteenth Amendment's Due Process Clause / Void-for-vagueness

16

In their complaint, Plaintiffs raised both a facial and as-applied vagueness challenge. The district court concluded that the Ordinance was not vague, but did not specify whether it was addressing the facial or as-applied challenge. Plaintiffs also do not clearly specify which kind of challenge they are pursuing on appeal.

We review de novo the district court's conclusion that the Ordinance was not unconstitutionally vague. United States v. Duran, 596 F.3d 1283, 1290 (11th Cir. 2010). Because the district court decided this claim on summary judgment, we take the evidence before the district court at that time in the light most favorable to Plaintiffs. Chapman v. AI Transport, 229 F.3d 1012, 1026-27 (11th Cir. 2000) (en banc); Schwarz v. City of Treasure Island, 544 F.3d 1201, 1211 (11th Cir. 2008). A law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." United States v. Williams, 128 S. Ct. 1830, 1845 (2008).

Language has limits and precision is rarely possible. An ordinance cannot be expected to address specifically every set of potential facts; a law need not be a book in length. When passing on the vagueness of a law, we must remember that, because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 92 S.

17

Ct. 2294, 2300 (1972). With that in mind, we turn first to Plaintiffs' as-applied challenge.

The Ordinance makes it "unlawful to knowingly sponsor, conduct, or participate in the distribution or service of food at a large group feeding at a park." A large group feeding is defined as "an event intended to attract, attracting, or likely to attract twenty-five (25) or more people." Plaintiffs contend that applying the Ordinance to an event that is "likely to attract twenty-five (25) or more people" fails to give fair notice and encourages discriminatory enforcement. Plaintiffs produced some evidence that for them to estimate how many people will show up at a food-sharing event is difficult.

Even if the Plaintiffs are correct that the "likely" provision fails to provide fair notice on its own, the potential vagueness -- if any -- is cured by the Ordinance's "knowingly" scienter requirement. See Hill v. Colorado, 120 S. Ct. 2480, 2498 (2000); United States v. Starks, 157 F.3d 833, 839-40 (11th Cir. 1998). Under Florida's rules of statutory interpretation applicable to criminal laws, the Ordinance provides no liability for a sponsor or participant that is surprised in good faith about the number of feeding participants at an event: a defendant's knowledge that the event is likely -- that is, may be reasonably expected to happen -- to attract twenty-five or more people is an essential element of the offense. See

18

Polite v. State, 973 So. 2d 1107, 1111-13 (Fla. 2007) (interpreting a criminal law applicable to "[w]hoever knowingly and willfully resists, obstructs, or opposes any officer" and concluding that knowledge of the officer's status is an essential element of the offense). Put differently, the Ordinance requires the City to prove to the pertinent fact finder in a trial that the defendant knew that it was probable that an event would attract twenty-five people or more. That knowledge may sometimes be hard for the City to prove, but that difficulty does not make the Ordinance unconstitutionally vague.

Plaintiffs contend that two other provisions of the Ordinance encourage, and have resulted in, arbitrary and discriminatory enforcement. Their first objection is to applying the Ordinance to the park's "adjacent sidewalks and rights-of-way." In their complaint, Plaintiffs alleged that they conducted feedings in areas close to, but not adjacent to, parks on at least six occasions. Plaintiffs produced some evidence that on one of these occasions, when they were serving food from a parking space approximately one block away from Lake Eola Park, a police officer informed them that they were in violation of the Ordinance because they were "adjacent" to the park.

In most cases, the plain meaning of the word "adjacent" leaves no doubt about which areas are covered by the Ordinance. See 1 Oxford English Dictionary

19

155 (2d ed. 1989) (defining adjacent as "[l]ying near or close (to); adjoining; contiguous, bordering"); The Random House Dictionary of the English Language 25 (2d ed. 1987) (defining adjacent as "lying near, close, or contiguous; adjoining; neighboring").  We suppose that, in a situation like the one described by Plaintiffs, it might be debatable whether an area one block away from a park is "adjacent" to the park (although we question whether the Ordinance goes so far).  But that a police officer may have some difficulty applying the Ordinance on the margins does not nearly establish that the Ordinance delegates to the officers "a virtually unrestrained power to arrest and charge persons with a violation."  Kolender v. Lawson, 103 S. Ct. 1855, 1860 (1983) (quoting Lewis v. City of New Orleans, 94 S. Ct. 970, 973 (1974) (Powell, J., concurring)).  An ordinance's constitutionality does not hang on whether every police officer would understand the ordinance in the same way in every conceivable factual circumstance.  Absolute clarity is too much to expect from the drafters of laws, and perfect knowledge of the fullest reach of the laws is too much to expect of even the most reasonable police officers. The term adjacent provides a sufficiently clear and definite standard to police officers and prosecutors.  See Grayned v. City of Rockford, 92 S. Ct. 2294, 2300-01 (1972) ("adjacent" to school not impermissibly vague); Cox v. Louisiana, 85 S. Ct. 476, 482-483 (1965) ("near" the courthouse not impermissibly vague).

Plaintiffs second objection -- also anecdotally based -- must suffer a similar

fate. Plaintiffs produced some evidence that, on at least one occasion, police

seemed to operate with the view that the Ordinance was inapplicable if there was a

unique sponsor for every twenty-five people participating in an event. The City

did not operate under this interpretation, however, when it later arrested Plaintiff

Montanez for noncompliance with the Ordinance.[14] The Ordinance makes it

unlawful to "sponsor, conduct, or participate" in a large group feeding without a

permit; and it defines a large group feeding as an <u>event</u> attracting twenty-five or

more people. Under the plain language of the Ordinance, therefore, the number of

sponsors <u>per</u> <u>event</u> is not important. Briefly stated, as long as a sponsor conducts a

separate event and fewer than twenty-five people participate in that particular

feeding event, the Ordinance is not triggered. The plain language of the Ordinance

does not prohibit more than one event from occurring at the same time in a park.

For us, this point is the important one about these historic-fact-based

arguments: that an ordinance may have been occasionally misinterpreted or

misunderstood by a few police officers or that different officers had different

interpretations does not render the ordinance unconstitutionally vague. Laws are

not constitutionally infirm simply because a particular police officer's subjective

---

[14]Plaintiff Montanez was acquitted at trial.

21

opinion about the law turns out to be incorrect.  See Joel v. City of Orlando, 232 F.3d 1353, 1360 (11th Cir. 2000) ("We do not find the evidence which Joel submitted indicating that the ordinance is subject to varying interpretations by City police officers problematic."); State v. Raffield, 515 So. 2d 283, 285 (Fla. 1st Dist. Ct. App. 1987) ("If the statutory language is sufficiently clear, the fact that officials place different interpretations on the statute does not make the statute void for vagueness.").

Here, we suppose that in some cases it may be, in fact, difficult for enforcement officers to distinguish multiple sponsors holding simultaneous different feeding events from a single larger event with multiple sponsors: two different sets of factual circumstances with different legal consequences.  "The problem that [circumstance] poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt."  Williams,  128 S. Ct. at 1846.  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."  Id.  Whether a sponsor's event had the requisite number of participants at its event to trigger the Ordinance is a pure question of fact for a given case, well within the competency of finders of fact at trial.  See id.

We therefore conclude that Plaintiffs have failed to demonstrate that the

Ordinance is vague as applied to them. About the facial challenge, those kinds of

challenges are disfavored; the general rule is that they are without merit unless a

plaintiff can demonstrate that the law is unconstitutionally vague in all of its

applications, Village of Hoffman Estates, 102 S. Ct. at 1191, or that the law

regulates a substantial amount of conduct protected by the First Amendment,

Williams, 128 S. Ct. at 1845. See also Duran, 596 F.3d at 1290. We have already

concluded that the law is capable of at least one constitutional application because

we have determined that it is not unconstitutionally vague as applied to Plaintiffs.

We have likewise already concluded that the Ordinance does not infringe

Plaintiffs' First Amendment rights. The Ordinance, on its face, does not regulate a

substantial amount of conduct protected by the First Amendment.[15]   Plaintiffs'

---

[15]This case is different from Konikov, relied upon by Plaintiffs. Konikov involved a facial vagueness challenge to a zoning ordinance that, on its face, implicated the core of the First Amendment by requiring a special use permit to operate a "religious organization" in a residential zone. 410 F.3d at 1320. Despite directly regulating constitutionally protected religious conduct, it was unclear to whom the ordinance applied because the ordinance provided no definition of "religious organization. " Id. at 1325, 1329-30. There, the plaintiff produced evidence that two members of the department responsible for enforcing the zoning ordinance -- one of whom was the department's manager -- differed in their view about how many times a religious group would need to meet in a week to trigger the ordinance's applicability. Id. at 1330-31. Because of the core First Amendment values implicated by that case, we concluded that the plaintiff's claim showing that the ordinance carried a risk of discriminatory enforcement should survive summary judgment. Id. at 1330-31. This case does not directly involve the same sort of core First Amendment concerns; so we should not conduct the same sort of searching facial review. Konikov does not -- and practically could not -- stand for the proposition that laws are unconstitutional whenever enforcement officers get confused or disagree about the precise factual scope of the law.

23

facial challenge must fail.

D.  Equal Protection Clause

The Church appeals the district court's determination on summary judgment that the Ordinance does not violate the Equal Protection Clause by exempting from the definition of "Large Group Feeding" the "activities of City licensed or contracted concessionaires, lessees, or licensees."  We review de novo the district court's decision.  See United States v. Johns, 984 F.2d 1162, 1163 (11th Cir. 1993).  "The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner."  Leib v. Hillsborough County Pub. Transp. Comm'n, 558 F.3d 1301, 1305 (11th Cir. 2009).

As the Church notes in its brief, because the distinction drawn by the law (those with City licenses or contracts, and those without them) does not involve a suspect classification, the rational basis test applies.  Id. at 1306.  Even if we accept for the sake of discussion that the exempted vendors and the general public are otherwise similarly situated, a rational basis exists for distinguishing between the two classes consistent with the City's asserted interests: the City could rationally conclude that it can more effectively regulate the vendors' conduct in parks

24

directly through the contracts or licenses. The vendor exemption does not violate the Equal Protection Clause.

E.    Florida Religious Freedom Restoration Act

The Church appeals the district court's conclusion that the Ordinance does not violate state law: the FRFRA. The district court determined that the Church shares food during religious services pursuant to a sincerely held religious belief, but concluded that the Ordinance does not substantially burden the Church's exercise of that practice. We agree with the district court that the Ordinance imposes no substantial burden on the Church.

We review the district court's factual findings for clear error, Mitchell v. Hillsborough County, 468 F.3d 1276, 1282 (11th Cir. 2006); but we review de novo its ultimate conclusion about whether the Ordinance violates the FRFRA, see Lawson v. Singletary, 85 F.3d 502, 511-12 (11th Cir. 1996) (discussing the standard of review applicable under a similar federal statute).

"The protection afforded to the free exercise of religiously motivated activity under the FRFRA is broader than that afforded by" the United States Constitution. Warner v. City of Boca Raton, 887 So. 2d 1023, 1032 (2004). Under

the FRFRA, a neutral law of general applicability must satisfy strict scrutiny when it "substantially burden[s] a person's exercise of religion." Id. An "exercise of religion" is "an act or refusal to act that is substantially motivated by a religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious belief." Id. A burden on religious exercise is only substantial if a person is prohibited from engaging in protected religious conduct (or, if the exercise of religion is a refusal to act, the person is compelled to act). See id. at 1033. Laws that merely inconvenience the exercise of religion do not create a substantial burden. See id. at 1035. The party claiming a violation of the FRFRA "bears the initial burden of showing that a regulation constitutes a substantial burden on his or her exercise of religion." Id. at 1034.

The district court determined that, to comply with the Ordinance, the Church would need to limit its services to twice per year, or rotate the services among parks in the District, or move the services to a park outside of the District.[16] Although the district court's order is not entirely clear to us, the court appeared to focus on the feasibility of the Church rotating its services among parks within the

_____

[16]At trial, the City contended that the Church could also serve food at Sylvia Lane, a site (apparently a converted parking lot with portable bathrooms) set aside within the District at which the restrictions of the Ordinance do not apply. The district court determined that this location was unsuitable. We need not and do not determine whether the district court's assessment of Sylvia Lane was correct.

District when deciding that the Ordinance imposed no substantial burden. The Church argued (and produced some evidence) that, if the services had to be moved, it is possible that some homeless members of the congregation would have difficulty learning of and traveling to the new location. But the district court found that the evidence at trial established that: (1) communication with the homeless is possible (by word-of-mouth); and (2) that the homeless have means of transportation available (bus service or walking). The district court considered the burden on the Church and its members "significant," but not "substantial." On appeal, the Church contends that the district court's factual findings about the feasability of communication and the availability of transportation are clearly erroneous in the light of the record.

Even if the Church is correct (which we doubt) that the district court's two factual findings are clearly erroneous, we would still conclude that the Church has not carried its burden under the FRFRA: the ability of the Church to rotate its services among the District parks is only minimally pertinent to the Ordinance's validity. The FRFRA does not provide the Church with a right to conduct its services at any location it desires; it does not guarantee access to the City's most desirable park (or, for that matter, any park at all).[17] At most, what the FRFRA

---

[17]The Church seems to acknowledge this principle. The Church makes the following two concessions in its appellate brief: (1) "Although the facilities at Langford Park suit the needs of

does is ensure that the City may not, without a compelling interest, affirmatively forbid the Church from feeding its members as part of its religious services.[18]

We assume only for the sake of argument that a congregation of indigents might present a unique problem under the FRFRA because, if no public space is available to conduct religious services, a law may have the result, in fact, of prohibiting the congregation's religious exercise. But, in such a circumstance, the FRFRA at most might require the City to provide some alternative public place where religiously motivated feeding can occur that is "minimally suitable" to that function. See Abbott v. City of Fort Lauderdale, 783 So. 2d 1213, 1214-15 (Fla. 4th Dist. Ct. App. 2001) (concluding that the trial judge, after determining that a park rule that prohibited feeding the homeless violated the FRFRA and ordering the city to provide an alternative space on public property where the feeding could occur, had the authority to determine whether the alternative space was "minimally suitable for the purposes intended"). The record in this case reveals that several parks outside of the District -- where the Ordinance is inapplicable -- contain

---

FVCG and Nichols well, they do not contend that by using another park with fewer amenities they would, by definition, be subjected to a substantial burden within the meaning of the FRFRA"; (2) "FVCG and Nichols are not claiming that the City must build new facilities at its parks to accommodate their religious worship."

[18]The Church does not contend that Langford Park is of particular religious significance.

28

amenities that make those parks at least minimally suitable for feeding.[19]

Conducting services at one fixed location outside of the District should alleviate the Church's concern about the communication difficulties associated with informing its indigent members of frequent location changes. And while using one of the nearby parks outside the District might result in some extra transit time for the Church's members (including requiring extra walking if transportation is, in fact, unavailable), we have earlier said that needing to travel some extra distance is insufficient to establish a substantial burden.[20] The record shows that several others parks are close to Langford Park. The Church does not contend, nor did the

_____

[19]From the record, we conclude that it is an undisputed fact that parks exist outside the District that are, at least, minimally suited for food service. And we can infer that factual finding from the record because it is consistent with the district court's FRFRA decision. See United States v. Robertson, 493 F.3d 1322, 1334-35 (11th Cir. 2007). Orlando's Director of Families, Parks and Recreation, gave testimony about the amenities available at various parks in Orlando -- both inside and outside the District. Plaintiffs did not attempt to rebut, and the district court appears to have relied on, that part of the Director's testimony.

[20]In Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1218-19 (11th Cir. 2004), we addressed a challenge by two synagogues to a zoning ordinance under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). RLUIPA and FRFRA use equivalent "substantial burden" standards. See Westgate Tabernacle, Inc. v. Palm Beach County, 14 So. 3d 1027, 1031 (Fla. 4th Dist. Ct. App. 2009). In Midrash, the challenged ordinance established eight zoning districts, but permitted churches and synagogues in only one (and even then, only if the church or synagogue obtained a conditional use permit). 366 F.3d at 1219. Because the members of the synagogues adhered strictly to Orthodox Judaism, they were unable to use cars or others means of transportation during the Sabbath. Id. at 1221. We rejected the synagogues' claim that forcing them to locate in the permissible district would substantially burden their members, even though the extra distance might mean that "congregants who are ill, young or very old" would be unable to attend services. Id. at 1227-28. We reached this result even though the synagogues suggested "that the significant decrease in attendance would require them to cease operations altogether." Id. at 1227.

29

district court find, that these parks are not at least minimally suitable for the Church's services.

The Ordinance does not forbid the Church and its members from engaging in their religious exercise; at most, the Ordinance imposes some inconvenience by requiring relocation outside the District. The district court was therefore correct to conclude that the Ordinance imposes no substantial burden, within the meaning of the FRFRA, on the Church.

## III. CONCLUSION

The Ordinance is constitutional, particularly as applied to both OFNB and the Church. The Ordinance also does not violate the FRFRA as applied to the Church. Because the Ordinance is enforceable, the permanent injunction against its enforcement must be vacated.

AFFIRMED IN PART, REVERSED IN PART, INJUNCTION VACATED.

APPENDIX

Sec. 18A.01.  Definitions.

The following terms, when used in this Chapter shall have the meanings respectively ascribed to them in this section:

. . .

(23)  *Large Group Feeding* is defined as an event intended to attract, attracting, or likely to attract twenty-five (25) or more people, including distributors and servers, in a park or park facility owned or controlled by the City, including adjacent sidewalks and rights-of-way in the GDPD, for the delivery or service of good. Excluded from this definition are activities of City licensed or contracted concessionaires, lessees, or licensees.

(24)  *Greater Orlando Park District (GDPD)* is defined as an area within the limits of the City of Orlando, Florida, extending out a two (2) mile radius in all directions from City Hall and including all of the parks and park facilities owned or controlled by the City touched by that radius, in their entirety.

Sec. 18A.09-2.  Large Group Feeding in Parks and Park Facilities Owned or Controlled by the City in the Greater Downtown Park District (GDPD).

Except for activities of a governmental agency within the scope of its governmental authority, or unless specifically permitted to do so by a permit or approval issued pursuant to this Chapter or by City Council:

(a) It is unlawful to knowingly sponsor, conduct, or participate in the distribution or service of food at a large group feeding at a park or park facility owned or controlled by the City of Orlando within the boundary of the Greater Downtown Park District without a Large Group Feeding Permit issued by the City Director of Families, Parks and Recreation or his/her designee.

(b) It is unlawful to fail to produce and display the Large Group Feeding Permit during or after a large group feeding, while still on site, to a law enforcement officer upon demand. It is an affirmative defense to this violation if the offender can later produce, to the City Prosecutor or the Court, a Large Group Feeding Permit issued to him/her, or the group, which was valid at the time of the event.

(c) The Director of Families, Parks and Recreation or his/her designee shall issue a Large Group Feeding Permit upon application and payment of the application fee as established by the City. Not more than two (2) Large Group Feeding Permits shall be issued to the same person, group, or organization for large group feedings for the same park in the GDPD in a twelve (12) consecutive month period.

(d) Any applicant shall have the right to appeal the denial of a Large Group Feeding Permit pursuant to appeal procedure in Section 18A.15 with written notice to the Director of Families, Parks and Recreation and with a copy to the City Clerk.

BARKETT, Circuit Judge, dissenting:

The members of Orlando Food Not Bombs ("Food Not Bombs")[1] began conducting weekly demonstrations in 2005 at a public park located in the heart of downtown Orlando in order to draw attention to society's failure to provide food to all and express their opposition to war. They did so by displaying signs and wearing buttons and t-shirts with the Food Not Bombs' logo and anti-war messages while simultaneously distributing free food to hungry and homeless persons. Under well-established Supreme Court precedent, Food Not Bombs has readily demonstrated that this conduct constitutes expressive conduct entitled to First Amendment protection and, therefore, I dissent.

The majority correctly notes that, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we [ask] whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." Texas v. Johnson, 491 U.S. 397, 404 (1989) (internal quotation marks and alterations omitted). The majority also correctly answers the first question in the affirmative, concluding that Food Not Bombs established the

---

[1] Orlando Food Not Bombs is an association of political activists affiliated with the international Food Not Bombs movement. It is undisputed that its members are opposed to war and violence and share the core belief that food is a right which society has a responsibility to provide to all.

33

requisite intent to convey a particularized message. However, the majority then answers the second question – whether the "likelihood was great that the message would be understood by those who viewed it" – in the negative. I believe this is an erroneous conclusion because it can only be reached by ignoring integral parts of Food Not Bombs' conduct and all the relevant Supreme Court precedent.

The majority claims that Rumsfeld v. Forum for Academic and Institutional Rights, Inc. ("FAIR"), 547 U.S. 47 (2006), requires that we look only to the act of distributing food and must be "deaf and blind" to the plaintiffs' buttons, t-shirts, and signs that would indicate to a reasonable observer that Food Not Bombs was expressing a message. But nowhere in FAIR does the Court hold, say, or even imply that the aspects of the conduct that includes words – the banners, signs, or t-shirts – cannot be considered in determining whether conduct is expressive under the First Amendment. Indeed, FAIR did not involve banners, signs, buttons, t-shirts, words, or any other external object at all that would convey the message. The conduct at issue in FAIR consisted of a military officer conducting interviews on the undergraduate campus, period.[2] There was simply no way an observer could tell by seeing the recruiter on an undergraduate campus that the law school

_____

[2] The law schools in FAIR wanted to "restrict military recruiting on their campuses because they object[ed] to the policy Congress ha[d] adopted with respect to homosexuals in the military" by having military recruiters interview on undergraduate campuses instead of on law school campuses. FAIR, 547 U.S. at 52-53.

34

was attempting to send a message by excluding military recruiters from the law school campus while permitting others to recruit there. As the Supreme Court noted, the expressive purpose of law schools requiring military recruiters to interview off-campus was not "overwhelmingly apparent" because "[a]n observer who sees military recruiters interviewing away from the law school has <u>no way of knowing</u> whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." <u>FAIR</u>, 547 U.S. at 66 (emphasis added and internal quotation marks omitted).

<u>FAIR</u> did nothing to change the clearly established law that the First Amendment <u>requires</u> us to consider conduct as a whole and in "the factual context and environment in which it was undertaken . . . ." <u>Spence v. Washington</u>, 418 U.S. 405, 410 (1974).[3] Rather, the <u>FAIR</u> Court's discussion of explanatory speech clarifies that conduct cannot be turned into protected expressive conduct if its message must be explained at a separate time and distance from the conduct itself. The totality of the conduct in <u>FAIR</u> was considered and found wanting.

To reach its result, the majority deconstructs the expressive conduct and strips it of every component save the act of handing out food; but the Supreme

---

[3] This is because "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." <u>Spence</u>, 418 U.S. at 410.

35

Court has told us that we must analyze whether conduct is expressive by viewing what is observable as a whole – not by dividing and isolating it into parts. To use the Supreme Court's example: the only way to differentiate a parade or a march – both clearly protected expressive conduct under the First Amendment – from a group of people heading to work or simply walking on the street is that a parade or march involves "[s]pectators line the streets; people march in costumes and uniforms, carrying flags and banners with all sorts of messages . . . ." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 591 (1995). Under the majority's view, the Court in Hurley would have ruled the parade unprotected because the only relevant conduct was walking, and walking is not protected expressive conduct. Obviously, that is not the law as Hurley expressly demonstrates.

Indeed, in every case posing the question of whether conduct is protected under the First Amendment, the Supreme Court has viewed observable conduct as a whole, rather than in isolated parts. In Edwards v. South Carolina, 372 U.S. 229, 235 (1963), the Court considered not only that a group of people were marching but also that they were singing the Star Spangled Banner when it recognized that their actions "reflect[ed] an exercise of [] basic constitutional rights." Similarly, theater is not analyzed as a person or group of people moving and talking or

36

singing, but is understood as drama – and protected by the First Amendment – when the conduct is viewed as a whole. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557-58 (1975). Likewise, in Schacht v. United States, 398 U.S. 58 (1970), in which the Court struck down a conviction for unauthorized use of a military uniform, the Court looked at not just the fact that a person was wearing a military uniform but also that he was doing so in a theatrical production criticizing the war in Vietnam.

Here, in "the factual context and environment in which [the conduct was] undertaken," a reasonable person viewing Food Not Bombs' demonstrations would observe that they (1) take place every week,[4] (2) at a centrally located public park,[5] (3) in an affluent neighborhood,[6] (4) are visibly run by a group whose name itself,

---

[4] In 2005, to draw attention to "society's failure to provide food and housing to each of its members and to reclaim public space," Food Not Bombs began conducting public feedings every Wednesday at 5:00 p.m. in Lake Eola Park.

[5] Lake Eola Park, the chosen location by Food Not Bombs for its events, contributes significantly to the expression of its message. The district court, therefore, rightly recognized that Lake Eola Park "is a meaningful location which, from time immemorial, has been the traditional public forum for free speech." The City does not dispute that Lake Eola Park, which is represented on the City's seal, is its "signature park."

[6] The park is located in a middle- and upper-middle class neighborhood of condominiums and businesses comprised of the very people Food Not Bombs wishes to reach with its message – the fortunate or privileged. As a Food Not Bombs member declared, "sharing food with those who have so little in the midst of those who have so much except concern and compassion for the least fortunate among them" is a way of sending a message to the fortunate about the social, economic and political inequalities that pervade society. Cf. Hurley, 515 U.S. at 568 (noting that parades are "public dramas of social relations" whose "dependence on watchers is so extreme that . . . if a parade or demonstration receives no media coverage, it may as well not have happened") (citation and quotation omitted).

37

Food Not Bombs, conveys an unmistakable message, (5) include activists holding signs or banners and wearing t-shirts and buttons to reinforce the group's central Food Not Bombs message, and (6) involve the distribution of food to the hungry and homeless in accordance with Food Not Bombs' purpose. Given the totality of the activity taking place at the park, a reasonable observer would understand the intended message that society should use its resources to feed the poor rather than to fund wars. Thus, it is hardly likely that a reasonable observer might think that the conduct at issue could be viewed as a "family having a reunion, a church intending to engage in a purely charitable act, [or] a restaurant distributing surplus food," as the majority suggests.[7]

The conduct at issue in this case is not ambiguous. The message conveyed by Food Not Bombs' is "overwhelmingly apparent" to a reasonable observer and therefore Food Not Bombs' conduct is protected by the First Amendment.[8]

---

[7] Furthermore, without any explanation, the majority dismisses the act of sharing food as one that has no history of symbolic expression. However, sharing food has significant meaning both in this country's history (e.g., Thankgiving) and in major world religions (e.g., Passover in the Jewish tradition, Communion in the Christian tradition).

[8] Having determined that the conduct of Food Not Bombs is protected by the First Amendment, I also agree with the reasoning and conclusion of the district court, reached after conducting a trial, that the ordinance does not further a substantial government interest. See First Vagabonds Church of God v. City of Orlando, Fla., 578 F. Supp. 2d 1353, 1360-61 (M.D. Fla. 2008).